685 So.2d 904 (1996)
MAYOR'S JEWELERS, INC., d/b/a MAYOR'S JEWELERS, Appellant,
v.
STATE OF CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Appellee.
No. 96-0879.
District Court of Appeal of Florida, Fourth District.
December 11, 1996.
Suzanne H. Youmans and Richard L. Allen of Engels, Pertnoy, Solowsky & Allen, P.A., Miami, for appellant.
John H. Pelzer and Brian S. McHugh of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellee.
KLEIN, Judge.
Appellant, a tenant under a commercial lease, notified appellee, its landlord, that it intended to break its lease in the mall known as Pompano Square. The landlord filed suit for a temporary injunction to restrain the tenant from vacating the store and to compel specific performance of the lease. The trial court granted a temporary injunction, which the tenant appeals. We reverse.
The provision of the lease on which the landlord relies to support its theory that the tenant can be enjoined from breaking its lease is as follows:

OPERATION OF BUSINESS
A. Open for Business. TENANT agrees to occupy and open the PREMISES for business, fully fixtured, stocked and staffed, and thereafter to continuously conduct its business in one hundred percent (100%) of the space within the PREMISES under the name designated, on all business days of the calendar year as described herein. TENANT recognizes that the covenants of TENANT in this ARTICLE 5 are a material consideration to LANDLORD hereunder in order that TENANT might produce the maximum gross sales possible from the PREMISES during the lease term and the continued operation of a full service regional retail development be assured.
This is a case of first impression in Florida; however, almost every other court confronted with this issue has denied injunctive relief requiring a tenant to specifically perform a lease.[1] Like the present case, these *905 cases involve malls or shopping centers with leases under which rent is wholly or partially dependant on the tenants' volume of business. Courts have declined to require continuation of these leases primarily for two reasons.
Most of the cases reason that the injunction would involve the court in having to supervise the future performance, thus putting the court "in the business of managing a shopping center." New Park Forest Assocs. II v. Rogers Enters., Inc., 195 Ill.App.3d 757, 142 Ill.Dec. 474, 479, 552 N.E.2d 1215, 1220 (1 Dist.1990); see also 8600 Assocs. v. Wearguard Corp., 737 F.Supp. 44 (E.D.Mich.1990); Lorch, Inc. v. Bessemer Mall Shopping Ctr., Inc., 294 Ala. 17, 310 So.2d 872, 876 (Ala. 1975). This general principle limiting injunctions is part of our jurisprudence. Calumet Co. v. Oil City Corp., 114 Fla. 531, 154 So. 141, 142 (Fla.1934) (denying specific performance of an oil well drilling contract because of the "inability of the court to undertake supervision of performance of such a contract"). See also Collins v. Pic-Town Water Works, Inc., 166 So.2d 760 (Fla. 2d DCA 1964).
Some of the courts have also denied these injunctions on the ground that the damages are purely economic and there is therefore an adequate remedy at law. 8600 Assocs.; Sizeler Property; see also Center Dev. Venture v. Kinney Shoe Corp., 757 F.Supp. 34 (E.D.Wis.1991). Our conclusion that injunctive relief should be denied under these facts, because it would require supervision by the court, makes it unnecessary for us to decide whether there was an adequate remedy at law in this case.
The landlord relies on two cases to support its argument that injunctive relief is available. In one of them, Lincoln Tower Corp. v. Richter's Jewelry Co., 152 Fla. 542, 12 So.2d 452 (Fla.1943), each tenant had agreed to remain open for business all year round except for holidays. The Florida Supreme Court decided that the tenant could be enjoined from breaching the lease. The case has been cited by landlords as standing for authority that a tenant can be enjoined from breaking a lease and vacating; however, we cannot agree with that broad interpretation. We construe that opinion as standing for the proposition that a tenant who intends to remain a tenant can be enjoined to remain open for business all year round as required by the lease. As our supreme court explained, the landlord was:
[D]oubtless actuated by a desire to protect and maintain the character of all the property leased to the appellee and its neighbors. By requiring all lessees to be open for trade continuously the unit fell in the category of a year-round business area as distinguished from a seasonal one. It was to its advantage also to require compliance with the restriction against closing because, in some of the leases, the income to the landlord depended to a stated degree on the amount of sales made by the tenants. Another purpose in enforcing the covenant was to assure to all of the tenants the advantage of continued business activity because a client or customer of any place of business in the locality was a potential client or customer, at least, of all the others. It was, therefore, important to the landlord, as well as the tenants, that the condition in the leases be observed by each for the benefit of all. The interests of the landlord and its tenants were in this situation inextricably bound together.
Id. 12 So.2d at 453. There is nothing in the opinion in Lincoln Tower which indicates that the tenant wanted to vacate the premises. The decision does not, therefore, in our opinion, authorize an injunction requiring the continuation of a lease where the tenant intends to terminate and vacate. At least one other court has distinguished Lincoln Tower on that same basis. See New Park Forest, 142 Ill.Dec. 474, 552 N.E.2d at 1218.
The only other case on point relied on by the landlord is Massachusetts Mutual Life Insurance Co. v. Associated Dry Goods Corp., 786 F.Supp. 1403 (N.D.Ind.1992). In that case, the tenant was a department store occupying one-sixth of the mall's space. The court entered a temporary injunction requiring the anchor tenant to stay there until there was a trial on whether a permanent *906 injunction would issue, but required, as a condition, that the landlord post a security bond in the amount of $1,000,000 to compensate the tenant if a permanent injunction were denied. The court also recognized that the relief it was granting was unprecedented. Id. at 1428-30. We decline to follow that case and adopt the majority view that this type of breach of contract is not susceptible to the remedy of an injunction requiring specific performance.
We therefore reverse the temporary injunction.
STONE, J., concurs.
FARMER, J., concurs specially with opinion.
FARMER, Judge, specially concurring.
While I join in the reversal, I do so for entirely different reasons than those expressed by the majority.
If I understand their analysis correctly, they have concluded that the landlord has shown irreparable harm by reason of the inadequacy of money damages. That, of course, leaves open the possibility that the landlord might otherwise be entitled to a mandatory injunction requiring the tenant to specifically perform the lease. They have further concluded, however, that judicial considerations of the public interesti.e., that courts would be required ultimately to take over the management of the demised premises in order to enforce the injunctionpreclude such relief. I cannot agree that an injunction would be proper under any set of facts in this case.
Article 5 of the lease requires Mayors, the tenant, to:
"occupy and open for business, fully fixtured, stocked and staffed, and thereafter to conduct its business in ... 100% of the space within the PREMISES under the name designated, on all business days of the calendar year...."
The parties describe this as a "continuous operations" clause. To explain the importance of the continuous operations clause, the lease states:
"TENANT recognizes that the covenants of TENANT in this ARTICLE 5 are a material consideration to LANDLORD hereunder in order that TENANT might produce the maximum gross sales possible from the PREMISES during the lease term and the continued operation of a full service regional retail development be assured."[2]
At the same time, in article 20 of the same lease, the parties also agreed as follows:
Recognizing the difficulty or impossibility of determining LANDLORD's damages for loss of Percentage Rent anticipated from TENANT and or other tenant[s] or occupants of the Shopping Center or for loss of value in the Shopping Center because of diminished saleability, mortgageability, adverse publicity or appearance which may result from any one or more of the events hereinafter enumerated, LANDLORD and TENANT covenant and agree that in the event TENANT shall fail to take possession of, construct and thereafter open the PREMISES for business, fully fixtured, stocked and staffed on the Commencement Date, or shall vacate or abandon the PREMISES, or shall cease to operate TENANT's business within the PREMISES as required by Article 5 hereof, then and in any of such events, LANDLORD shall have the right to collect not only the Fixed Minimum Rent, Percentage Rent and Additional Rent reserved, but also the Percentage Rent paid or payable during the last full calendar year prior to the year in which such default occurs for the period during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such amount to constitute liquidated damages in lieu of any Percentage Rent that might have been earned by LANDLORD during such period. The parties hereto agree that it will be impractical or extremely difficult to ascertain the actual damages suffered by LANDLORD *907 in the event of such default by TENANT, and therefore agree that the sum stated as liquidated damages for the above default by TENANT constitutes fair and adequate consideration to LANDLORD by reason of such default. [e.s.]
Up to that point, article 20 creates what we all recognize is a mine-run "liquidated damages" clause. Because Florida law holds that it is possible for contracting parties to agree to a liquidated damages clause that supplies the exclusive remedy for specified breaches, see, e.g., Coastal Computer Corp. v. Team Mgt. Systems Inc., 624 So.2d 352 (Fla. 2d DCA 1993); Hatcher v. Panama City Nursing Center Inc., 461 So.2d 288 (Fla. 1st DCA 1985); Dillard Homes Inc. v. Carroll, 152 So.2d 738 (Fla. 3d DCA 1963), the parties added the following provision to article 20:
"LANDLORD may also elect to treat such action or omission by TENANT as an event of default as hereinabove described and to exercise any remedy therefor, whether reserved in this lease or available at law or in equity."
This final sentence to article 20, which I shall call a cumulative remedy clause, is obviously designed to make it clear that the liquidated damages clause is not the exclusive remedy for a breach of the continuous operations clause and that the landlord may resort to any other remedy provided by law or equity.
In spite of this plain contractual concession as to an adequate monetary remedy, landlord nevertheless argues that the cumulative remedy clause entitles it to an injunction mandating continuous operations by tenant. I cannot agree with that argument. The manifest function of the cumulative remedy clause is, if tenant breaches the continuous operations clause by permanently closing its store, to permit landlord also to seek eviction and thereby secure a new, attractive replacement tenant. But contrary to landlord's argument, the reservation of all of a contracting party's legal and equitable remedies has never been understood as creating an equitable remedy that is otherwise lacking. Certainly, landlord cites no Florida case so holding.
Landlord does rely on Lincoln Tower Corp. v. Richter's Jewelry Co., 152 Fla. 542, 12 So.2d 452 (1943), however, to support its claim to the injunction. The lease in that case provided that "[t]he lessee shall remain open for business [the] year `round and shall not close excepting on holidays and after ordinary hours for business." The court explained the provision thus:
"It was doubtless actuated by a desire to protect and maintain the character of all the property leased to the [tenant] and its neighbors. By requiring all lessees to be open for trade continuously the unit fell in the category of a year-round business area as distinguished from a seasonal one. It was to its advantage also to require compliance with the restriction against closing because, in some of the leases, the income to the landlord depended to a stated degree on the amount of sales made by the tenants. Another purpose in enforcing the covenant was to assure to all of the tenants the advantage of continued business activity because a client or customer of any place of business in the locality was a potential client or customer, at least, of all the others. It was, therefore, important to the landlord, as well as the tenants, that the condition in the leases be observed by each for the benefit of all. The interests of the landlord and its tenants were in this situation inextricably bound together."
12 So.2d at 453. The issue in Lincoln Tower was whether the landlord was entitled to injunctive relief when the tenant decided to close the store for part of the year.[3]
The tenant showed that it encountered difficulty in finding clerks skilled in the trade to operate its store full time. Of course, the lawsuit took place in the middle of World War II, and thus the lack of experienced help is quite understandable. Indeed, the court itself conceded this much, saying:
"In the present stressful times [sic] appellee may well be encountering extreme difficulty in engaging those whom he considers suitable to manage or operate the enterprise but this is a hardship that *908 should not be visited upon the appellant and the other lessees." [e.s.]
12 So.2d at 453. The court reasoned in allowing a mandatory injunction:
"The appellant quite properly applied to a court of equity for relief against a breach of the covenant by the appellee. Thus it could obviate further breaches not adequately compensable in a court of law.... It was doubtless actuated by a desire to protect and maintain the character of all the property leased to the appellee and its neighbors."
Id. The court added:
"We disagree with the observation of the chancellor that the appellant should be required to seek his remedy in a court of common law. It appears that it would be impractical, if not impossible, to establish the damage to the lessor, or the lessees, resulting from a breach of the covenant and that the remedy at law would, therefore, not be adequate. For that matter, we think that the suit in chancery by the former would have been proper, even though no particular damage could have been shown to have arisen from the violation."
12 So.2d at 453-54. Thus the impracticality or impossibility of proving damages resulting from part-time operations was the basis for the equitable remedy of a mandatory injunction. But the present case is categorically different because here, unlike Lincoln Towers, the contracting parties agreed on an adequate damages remedy.
The concept of ordering parties to a civil dispute to engage in specific conduct arises from equity jurisprudence. Equity was devised as an alternative to the common law. It resulted from the failure of the common law to afford any relief, that the party would suffer harm without a remedy, and the circumstances were such that fairness and justice demanded relief. It began as an entirely separate system from the common law courts, in different buildings with different officials. Initially, equitable relief was given by the King through his chancellor. It was indispensable to the award of such relief that the equity applicant show that, without the assistance of equity, he would suffer harm without a remedy. In other words, he had to show the lack of any relief available in the law court.
That essential requirement has survived the merger of law and equity in the jurisprudence of this state. To place oneself within equity "jurisdiction," it is still indispensable for the suitor to show that harm is imminent from which he lacks the availability of any relief under the common law. Egan v. City of Miami, 130 Fla. 465, 178 So. 132 (1938); Johnson v. Killian, 157 Fla. 754, 27 So.2d 345 (1946); Orlando Sports Stadium Inc. v. State ex rel. Powell, 262 So.2d 881 (Fla.1972). As one district court in this state succinctly put it:
"If irreparable harm will result to the movant from a denial of the relief sought, and he is without an adequate remedy at law, relief by injunction is proper."
Groff G.M.C. Trucks Inc. v. Driggers, 101 So.2d 58, 60 (Fla. 1st DCA 1958). More specifically:
"Irreparable injury is an injury of such nature that it cannot be redressed in a court of law; an injury for which monetary compensation will not suffice."
Gonzalez v. Benoit, 424 So.2d 957, 959 (Fla. 3d DCA 1983), receded from on other grounds, Nash v. Hunt, 434 So.2d 51 (Fla. 3d DCA 1983). In other words, if the party seeking equitable relief has a right to monetary compensation that is fair and adequate, then the court lacks equitable jurisdiction to enter an injunction.
As we have just seen, however, in the same lease under which this landlord claims the right to enforce article 5 by mandatory injunction, the landlord has expressly agreed that "the sum stated as liquidated damages for the above default by TENANT constitutes fair and adequate consideration to LANDLORD by reason of such default." [e.s.] Hence, even though equity jurisprudence holds that the essential basis for an injunction is the inadequacy of money damages, the proponent of equitable relief in this case has openly agreed that it has an adequate remedy in money damages for violation of the very covenant that he seeks to enforce by injunction.
*909 The majority has failed to explain why an express agreement as to the adequacy of money damages to remedy a particular breach does not displace equitable jurisdiction. Instead, by its reversal on considerations of the public interest, the majority has rather obviously concluded that the landlord has shown the inadequacy of money damages and thus that an injunction is otherwise proper. That conclusion is apparently predicated on the landlord's argument that the shopping center has not generated enough revenues to make the liquidated damages provision sufficiently remunerative.
There are three kinds of rent due under this lease. First, there is the "Fixed Minimum Rent" that is due in all events. Next, there is "Percentage Rent", defined as 5% of annual gross sales above $1,876,000, that is due in addition to the fixed minimum rent. Finally, there is "Additional Rent", defined as real estate taxes and assessments, common area costs, and shopping center promotional costs, which is due in addition to both of the foregoing rents. The liquidated damages provision is tied to the percentage rent in the year preceding the year of the breach. The facts adduced below show that revenues for the preceding year fell below the amount triggering percentage rent, and thus the liquidated damages provision yields nothing above the fixed minimum rent under these circumstances.
Landlord argues that "a party will not be limited to relief specified in a liquidated damages clause if, under the circumstances, the clause will fail of essential purpose." It cites Varner v. B.L. Lanier Fruit Co., 370 So.2d 61 (Fla. 2d DCA 1979), to support that as a general proposition. But Varner involved a buyer's breach of an "output" contract for the sale of fruit. Buyer invoked section 672.719(2), Florida Statutes (1975), in the Florida Uniform Commercial Code. That statute allows the court in a sale of goods case to excuse a limited remedy that fails of its essential purpose. The court concluded that the liquidated damages clause failed because it was based on a deposit that had long since been earned by seller when buyer refused to pay for the balance of the crop. In my opinion, Varner is limited to cases under the Sales article of the Uniform Commercial Code. I do not believe that this UCC provision should be used by judges to relieve parties of their contractual obligations in shopping center leases.
Even if I did agree that this UCC precedent could properly be applied generally in all contract litigation, I would decline to apply it under the circumstances of this case. Landlord argues that the liquidated damages provision has proved improvident as a result of a recent downturn in the fortunes of this shopping center. The number of patrons has dwindled in recent years, and several stores have been sold or closed. As a result, the landlord is not deriving as much rent, because tenant revenues have not been sufficient to trigger the obligation to pay percentage rent. Hence, the liquidated damages provision is to landlord, in retrospect, improvident.
To say that this particular liquidated damages provision has failed of its essential purpose because, after several years, revenues have declined to the point that few if any tenants are paying percentage rent, is to ignore the perspective of the tenant. Indeed, given the text of the continuous operations clause, it is not farfetched to suppose that tenant wanted contractual shelter against the very eventuality we confront today. That is, tenant bargained to protect itself from a future downturn in revenues at this particular mall. In this clause, tenant bargained for a monetary hedge against some court requiring it to continue subsidizing a retail operation that has become an economic burden.
The liquidated damages clause serves two primary purposes: (1) it gives the landlord a specific remedy that the law might not otherwise give in the event of the tenant's breach of occupancy; and (2) it sets limits on the tenant's damages exposure and provides certainty as to the tenant's obligations if the shopping center becomes undesirable. To accept the landlord's argument of insufficiency of damages is to give the landlord the benefit of the clause but not the burden and erodes the tenant's interest in the provision. Would the court have been equally willing to forgive the burden if the tenant alone had *910 fallen on hard times and wished simply to close some of its outlets, including the one in this mall, but balked at paying the full liquidated damages in a prosperous mall? Landlord omits any explanation as to why this very circumstance was not within the contemplation of the parties when contracting. I would not allow the landlord to walk away so conveniently from its bargain. Rather, I would hold that the article 20 liquidated damages provision operates to bar injunctive relief.
Even if the liquidated damages clause did not exist, however, there is still another equally important reason why I would not reach the issue of the difficulty of the trial judge in enforcing the injunction. There are basically two kinds of injunctions: (1) prohibitory injunctions, which act to restrain specific conduct; and (2) mandatory injunctions, which act to command specific conduct. Our supreme court has discussed this difference, saying:
"Mandatory injunctions are looked upon with disfavor, and the courts seem even more reluctant to issue them than prohibitory ones. Allen v. Stowell, 145 Cal. 666, 79 P. 371, 68 L.R.A. 223, 104 Am.St.Rep. 80. One court has announced that relief of this kind `for the most obvious reasons should be granted only in situations which so clearly call for it as to make its refusal work real and serious hardship and injustice.' Lyons v. Walsh, 92 Conn. 18, 101 A. 488, 490, L.R.A.1917F, 680."
Johnson v. Killian, 157 Fla. 754, 27 So.2d 345, 346 (1946); see also First Nat'l Bank in St. Petersburg v. Ferris, 156 So.2d 421 (Fla. 2d DCA 1963). In Miami Bridge Co. v. Miami Beach Ry.Co., 152 Fla. 458, 12 So.2d 438 (1943), the court explained:
"We have held in several cases that mandatory injunctions are rarely granted before final hearing, or before the parties have full opportunity to present all the facts in such manner as will enable the court to see and adjudge what the truth may be. However, there are cases holding that relief by way of mandatory injunction may be granted on a proper showing made. In Florida East Coast R. Co. v. Taylor et al., 56 Fla. 788, 47 So. 345, this Court said:
"`It is settled by an overwhelming weight of authority that, except in rare cases, where the right is clear and free from reasonable doubt, a mandatory injunction, commanding the defendant to do some positive act, will not be ordered except upon final hearing, and then only to execute the judgment or decree of the court. Hunt v. Sain, 181 Ill. 372, 54 N.E. 970.'"
12 So.2d at 443. I don't believe anyone seriously contends that this landlord's right to a temporary mandatory injunction is "clear and free from reasonable doubt." To the contrary, it is quite tenuous.
One circumstance where mandatory injunctions are almost always denied is in the enforcement of employment or personal service contracts. Taylor v. Fla. East Coast Ry. Co., 54 Fla. 635, 45 So. 574 (1907); Montaner v. Big Show Productions S.A., 620 So.2d 246 (Fla. 3d DCA 1993); Mosely v. DeMoya, 497 So.2d 696 (Fla. 3d DCA 1986); Mike Smith Pontiac GMC Inc. v. Smith, 486 So.2d 89 (Fla. 5th DCA 1986); Melzer v. Jacob Agay H., 426 So.2d 1049 (Fla. 3d DCA), rev. denied, 438 So.2d 833 (Fla.1983); Adjmi v. Pankonin, 126 So.2d 153, 155 (Fla. 3d DCA), cert. denied, 129 So.2d 141 (Fla. 1961). In my opinion, requiring a tenant by specific performance to occupy leased premises for the full term of a lease, as opposed to remedying a breach of occupancy by money damages, is much akin to requiring an employee to serve out his contractual term of employment rather than mulcting him in money damages for the breach. In either instance, mandatory injunctions should simply be unavailable.
This case is a fertile field for those who see civil law as applied economics. The facts involve a shopping center that was once a prime location for merchants of the kind involved here. At one time, this mall had 3 of the leading department stores in southeast Florida, and this tenant was the only upscale jeweler there. Alas, the area has since fallen on hard times. The mall is now only 70% occupied, and several of its former attractions have closed. One of its former anchor *911 tenants, Jordan Marsh, no longer even exists and has been succeeded by a different retailer. Landlord has twice been unsuccessful properly so, in my opinionin persuading other trial judges to enjoin store closings by Morrisons Cafeteria and Rite-Aid Drugs.[4]
Apparently, the mall is sliding downward toward the end of its business life, and the landlord is fighting a last ditch effort to slow the inevitable end. While it is understandable for the landlord to do so, that does not mean that judges should agree with its litigation tactics. An important question for the aficionados of law and economics is whether a court's equitable powers should be employed to slow inexorable economic change. If distressed businesses are forced to continue sustaining operations of failing retail outlets when no recovery is likely, are the best interests of society being served by judges requiring them to continue? Indeed, if as here the tenant recognizes that it must continue to pay rent even though it has ceased its operations, what purpose is served by the intervention of equity, other than to support the unproductive economic decisions of the landlord?
I concur in reversal but only for the reasons I have stated.
NOTES
[1] New Park Forest Assocs. II v. Rogers Enters., Inc., 195 Ill.App.3d 757, 142 Ill.Dec. 474, 478-79, 552 N.E.2d 1215, 1219-20 (1 Dist.1990); 8600 Assocs. v. Wearguard Corp., 737 F.Supp. 44 (E.D.Mich.1990); Sizeler Property Investors, Inc. v. Gordon Jewelry, Corp., 544 So.2d 53 (La.App.4 Cir.1989); Madison Plaza, Inc. v. Shapira Corp., 180 Ind.App. 141, 387 N.E.2d 483 (1979); Lorch, Inc. v. Bessemer Mall Shopping Ctr., Inc., 294 Ala. 17, 310 So.2d 872, 876 (1975); Grossman v. Wegman's Food Mkts., Inc., 43 A.D.2d 813, 350 N.Y.S.2d 484 (1973); Ambassador Foods Corp. v. Montgomery Ward & Co., 43 Ill.App.2d 100, 192 N.E.2d 572 (1963); Security Builders, Inc. v. Southwest Drug Co. Inc., 244 Miss. 877, 147 So.2d 635 (1962); Price v. Herman, 81 N.Y.S.2d 361 (1948), aff'd, 275 A.D. 675, 87 N.Y.S.2d 221 (1949); Laker v. Soverinsky, 318 Mich. 100, 27 N.W.2d 600 (1947); Green v. Bay City & Port Huron R.R., 158 Mich. 436, 123 N.W. 4 (1909); Grape Creek Coal. Co. v. Spellman, 39 Ill.App. 630 (1891).
[2] I note that this conspicuously omits any provision that the landlord is entitled by agreement of the parties to a mandatory injunction enforcing the covenant if the tenant should decide to close its store before the end of the term of the lease.
[3] This, of course, contrasts with the present case in which the tenant has decided instead to cease its operations entirely and close the store permanently.
[4] Rite-Aid, it turn out, is immediately across the way from Mayors. If this injunction were to stand, one tenant will have been required to remain in business while two others were allowed to close.