Fabricant, J.
INTRODUCTION
This is an action for specific performance of a commercial lease. The plaintiff landlord owns a shopping center, known as Woburn Plaza, on the Woburn/Winchester line. The defendant tenant contracted to lease space in which to operate a Boston Chicken (now Boston Market) Restaurant. Although the lease term runs until April of 2000, the defendant, finding the location unprofitable, ceased operations there on August 23, 1997. Defendant has continued to pay its rent under the lease, and professes its willingness to “negotiate with the landlord a payment to terminate the lease and to assist the landlord in obtaining a substitute tenant.” Nevertheless, plaintiff, viewing the defendant’s closure as harmful to the shopping center as a whole, seeks to compel the defendant to reopen its store and to operate the store for the remainder of the lease term. Presently before the Court is the plaintiffs motion for a preliminary injunction to require the defendant to resume operations at the site pending the outcome of this case.
FACTUAL BACKGROUND
Woburn Plaza consists of a total of approximately 184,467 square feet of space. It contains a Star Market, Toys ‘R Us, and Oseo Drug store, along with approximately eight smaller stores. The space leased by the defendant, for use as a restaurant serving largely on a take-out basis, contains 2,060 square feet, approximately 1.2% of the gross leasable area of the shopping center. The lease provides for payment of base rent in a fixed monthly amount, plus percentage rent based on gross sales above a specified “breakpoint.” The parties’ lease agreement, entered into on April 23, 1990, has a term of ten years, ending on April 30, 2000. The lease provides, in paragraph 8.2(h), as follows:
Tenant covenants that ... it shall continuously operate its business in 100% of the demised premises, at all times in a first-class manner consistent with reputable business standards and practices so as to produce the maximum volume of sales and to help establish and maintain a high reputation for the Shopping Center.
Tenant acknowledges that this obligation ... is a material inducement to the Landlord to enter into this lease, and in the event Tenant defaults hereunder, Landlord shall have all remedies available to it at law or in equity including, without implied limitation, the right to terminate this lease.
The defendant has found business traffic and volume at the site insufficient to cover its expenses. During the approximately seven months ending on July 13, 1997, the defendant’s store suffered a “cash flow loss of $50,527.” The store’s revenue has not passed the “breakpoint,” so that no percentage rent has been due.[1]
Each of the parties has submitted an affidavit of an employee with relevant knowledge of its business. Both affiants express general opinions, unsupported by analysis of any actual data, about the role of the defendant’s store in the shopping center. Plaintiffs affidavit asserts that defendant’s business is a “traffic generator,” bringing customers, particularly affluent customers, into the shopping center, and thereby generating business for the other stores there as well. Accordingly, plaintiffs affidavit predicts that the closure of the defendant’s store will adversely affect the revenue of all stores in the center, thus reducing the percentage rent paid by other tenants; that it will render the center less attractive to potential tenants; and that these effects cannot be avoided by the sub *571 stitution of another tenant, since the defendant is “uniquely attractive and suitable to the location.” Defendant’s affidavit disputes these assertions, pointing out the relatively small part of the center’s square footage involved, and asserts that “operation of the Boston Market store is not likely to have an effect upon the basic financial success or failure of the shopping center. It is only one factor and a veiy small factor.”
DISCUSSION
Under the well-established test of Packaging Industries Group v. Cheney, 380 Mass. 609, 617 (1980), a preliminary injunction is warranted only when the moving party establishes both a likelihood of success on the merits of the claim, and a substantial risk of irreparable harm in the absence of an injunction. Once these factors are established, the Court must balance them against the harm that an injunction -will inflict on the opposing party, and must also consider the impact on the public interest. See T&D Video, Inc. v. City of Revere, 423 Mass. 577, 580 (1996).
Here the defendant essentially concedes that it has committed a breach of contract. That concession, however, does not establish the plaintiffs likelihood of success on the merits of its claim for specific performance. To show a likelihood that it would succeed in obtaining that extraordinary relief, plaintiff must show that, after balancing the equities and considering the availability and adequacy of damages to remedy the breach, a court would exercise its discretion to grant specific performance. See Greenfield Country Estates Tenants Association, Inc. v. Drew, 423 Mass. 81, 87-90 (1996). In this respect, the first and second factors tend to merge; the inadequacy of damages as a remedy enhances the likelihood that specific performance would be awarded at the conclusion of the case, and at the same time demonstrates that the harm to the plaintiff absent an injunction during the period of the litigation will be irreparable. Public interest considerations, particularly those involving the propriety of long-term judicial supervision of the operation of a business, are also likely to influence a court’s exercise of discretion as to the ultimate remedy. Thus, the plaintiffs likelihood of success on the merits depends on all of the same factors that must be weighed in considering the request for preliminary injunctive relief.
While not contesting its breach of the lease, the defendant vigorously contests the propriety of specific performance. The defendant relies on a line of cases from other jurisdictions denying injunctions to compel the continued operation or reopening of businesses in shopping centers.[2] E.g. CBL Associates, Inc., v. McCrory Corp., 761 F.Sup. 807 (M.D. Ga. 1991); 8600 Associates Ltd. v. Wearguard Corp., 737 F.Sup. 44 (E.D. Mich. 1990); New Park Forest Associates II v. Rogers Enterprises, Inc., 195 Ill.App.3d 757 (1990); Madison Park, Inc. v. Shapira Corp., 180 Ind.App. 141 (1979). These cases, in general, acknowledge the interdependence of stores in a shopping center, and the consequent difficulty of ascertaining damages from the closure of a single store, but nevertheless deny injunctive relief on the grounds that monetary damages are available, and that the issuance of an injunction would impose on the court an undue burden of long-term, continuous supervision of the operation of a business.
In response, the plaintiff relies on Massachusetts Mutual Life Insurance Company v. Associated Dry Goods Corporation, 786 F.Sup. 1403 (N.D. Ind. 1992). In that case the court acknowledged the unprecedented nature of the injunction sought, and the strong weight of authority against the issuance of specific performance under similar circumstances. It concluded, however, based on extensive factual findings entered after an evidentiary hearing, at which the plaintiff presented expert testimony as well as the testimony of operators of other stores in the mall, that the plaintiff in that case had made the necessary showing of severe harm for which no available remedy at law could compensate. Based on that showing, the court issued a preliminary injunction ordering the reopening of an Ayres department store that had closed in violation of its lease.
The Mass. Mutual case may establish that specific performance can be granted on a sufficient factual showing, but a review of the court’s lengthy and detailed opinion in that case reveals substantial and highly significant factual differences from the present dispute. Most significant is that the store in issue there was indisputably one of three anchor stores in the shopping mall, occupying one sixth of the mall’s total square footage, and drawing in a substantial proportion of the customers who would then patronize the mail’s other tenants. Its closure, the court found, would reduce occupancy in the mall from about 81% to about 60%, and would substantially reduce traffic in an entire wing of the mall. Further, the Court found that a significant number of the mail’s other leases were due to expire during the remaining portion of the Ayres lease, that the closure of the Ayres store would substantially affect the willingness of those tenants to renew their leases, and that some of the other tenants had provisions in their leases, which they would exercise, permitting them to terminate in the event of closure of an anchor store. The Court further found that acquiring a new anchor tenant would be a lengthy and complex process that could not be completed in time to prevent the adverse impact of the Ayres closure. Overall, the Court found that the closure of the Ayres store posed a real risk of causing the closure of the entire mall.[3]
The showing of harm made in this case does not approach that found by the Court in Mass. Mutual. No expert analysis of any market data has been offered; plaintiff relies solely on the affidavit of its own employee, who asserts plausible, but imprecise and unsupported, predictions of harm. The Boston Market store is clearly not an anchor, and the parties actively dispute whether it draws any customers into the *572 shopping center for the benefit of other tenants. Its proportion of the center’s space is small, and no facts have been presented as to how its closure affects the overall occupancy rate. Nor is there any evidence as to any efforts by the plaintiff to find a compatible replacement tenant, or as to any obstacles to such efforts. Plaintiff does not even suggest that closure of this one store threatens the economic viability of the center as a whole. Thus, Mass. Mutual, rather than supporting the plaintiffs likelihood of success on the merits, tends by its factual contrasts to show the unlikelihood that the plaintiff will ultimately obtain specific performance.
Plaintiff cites the lease agreement, particularly its references to remedies at law and in equity. Plaintiff reads this as an express consent to specific performance. The language, however, is not so clear. It does not contain the phrase “specific performance,” or “in-junctive relief,” or any similarly express terms, although no reason appears that the parties could not have used such terms if their intention was as the plaintiff contends. In context, the lease provision may mean nothing more than that the plaintiff would be entitled to evict the tenant for breach of the obligations set forth in the cited paragraph. See Mayor’s Jewelers, Inc. v. State of California Public Employees’ Retirement System, 685 So.2d 904, 906 (concurring opinion) (Fl.App. 1996).
Overall, I cannot conclude that the plaintiff has a likelihood of succeeding on the merits of its claim for specific performance, despite the apparently undisputed breach of the lease. Nor is the plaintiffs showing of irreparable harm sufficiently strong to outweigh the relative weakness of its showing on the likelihood of success. Damages may be difficult to prove, but trial courts regularly resolve disputes presenting challenges of proof in the areas of causation and damages. As the Mass. Mutual opinion demonstrates, experts exist in relevant fields who are capable of analyzing available data and presenting well-founded opinions on the effects of various business factors. Finally, the public interest weighs against the grant of a preliminary injunction that would require the court to supervise the on-going operation of a business, “in a first-class manner,” for as much as thirty months. Weighing of all these factors dictates that the motion for preliminary injunction must be denied.
CONCLUSION
For the reasons stated, the Motion for Preliminary Injunction is DENIED.

 The defendant has submitted an affidavit of its employee stating that ‘The revenue is not sufficient to generate percentage rent under the lease.” Referring to no time frame, the statement leaves unclear whether percentage rent has been generated at any point during the lease term, and if so, how recently. Plaintiffs affidavit, however, does not state that percentage rent has been generated; it refers to the defendant’s percentage rent only as an “opportunity” that is lost with the store’s closing. I infer from the defendant’s affidavit, and from the absence of any contrary information in the plaintiffs affidavit, that sales volume at the store has been below the “breakpoint" either throughout the tenancy or for a sufficiently long period of time that the plaintiff could have no reasonable expectation that normal operation of the defendant’s store would generate percentage rent within the remainder of the lease term.

 Neither side has cited any Massachusetts cases on point, and the Court has found none.

 It is noteworthy that the injunction issued in the Mass. Mutual case was stayed pending appeal. Mass Mutual, No. 92-1232, 1992 WL 100397 (7th Cir. Feb. 10, 1992). This Court has found no reported decision on the appeal, suggesting that the case was resolved while the appeal was pending.