GROSS, J.
This consolidated appeal centers upon the attempts of a guardian and his attorneys to recover guardianship administration fees from a joint investment account held by a ward and his spouse that was part of a guardianship estate. We affirm the orders authorizing the guardian to access the account after the death of the ward and reverse the order that barred access to the account. .
Jack Olshen (“the Ward”) and his wife Irene were married in 2004, when the Ward was in his mid-seventies and Irene was 10 years his junior. In January 2010, the Ward sold Olshen Overseas, Inc., the business he had owned and operated for forty years, receiving approximately $1,800,000.00 in net proceeds. Within thirty days of closing, the funds were deposited into a joint brokerage account at Oppenheimer & Co. (“Oppenheimer Account”),[2] entitled: “Jack Olshen & Irene Olshen JTWROS” — an acronym for joint tenants with right of survivorship. Under Oppenheimer’s policy, withdrawal from the account required both owners’ signatures.
In September 2010, the 81-year-old Ward filed for dissolution of marriage in the circuit court. To prevent Irene from depleting his assets, the Ward also obtained a temporary injunction freezing the parties’ marital assets. Irene responded to the .lawsuit by counter-petitioning for dissolution and filing verified petitions seeking (1) to determine the Ward’s mental incapacity and (2) to appoint an emer *914 gency temporary guardian. In her petitions, Irene made, indirect reference to the Oppenheimer Account, stating that the property “subject to guardianship” exceeded $1,400,000.00.[3]
Finding the Ward incapacitated due to dementia, the trial court appointed a “professional guardian,”[4] appellant Anthony Romano (“Guardian”), to serve as guardian of the Ward’s person and property. In addition, the trial court modified the temporary injunction to lift the freeze placed upon the Oppenheimer Account. A significant legal effect of the guardianship was to stay the dissolution proceeding for “at least 3 years.” § 61.052(l)(b), Fla. Stat. (2012).[5]

The Accumulation of Fees

Shortly after his appointment, the Guardian filed a verified inventory of the guardianship estate, which listed the Oppenheimer Account as the estate’s primary asset. The Oppenheimer Account comprised 89% of the $1,454,903.03 net value of the guardianship estate.
On May 27, 2011, the Guardian petitioned for instructions regarding whether divorce proceedings should be abated for three years on account of the Ward’s incapacity. Recognizing the ramifications of an abatement, Irene filed an urgent motion in the divorce court seeking to stay proceedings pending a determination of the validity of a 2004 prenuptial agreement and an accompanying 2008 amendment, both of which, she claimed, were triggered by the Ward’s dissolution petition.
Following a hearing, the trial court ordered the dissolution proceeding abated for a period of three years, pursuant to section 61.052. As a residual effect, Irene’s motion regarding the prenuptial agreement was placed on indeterminate hold. Shortly thereafter, the trial court denied a second motion from Irené, which sought to compel a settlement of the claim involving the prenuptial agreement in accordance with section 744.387, Florida Statutes (2012).

The Attempts to Access the Oppenheimer Account

With the Ward’s estate mired in dispute, the Guardian and his attorneys accumulated fees beyond the Ward’s tangible non-Oppenheimer Account assets. For example, appellee David Howard Goldberg, P.L., obtained an order awarding $53,051.55 in fees for the services performed for the Guardian from February 1, 2011, through March 31, 2011. Since the Ward’s uncontested assets were insufficient to satisfy this amount, the trial court reserved ruling on the source of payment.
To resolve the question of payment, the Guardian filed the following three petitions, which sought to transfer funds from the Oppenheimer Account to cover outstanding fees and expenses:
(1) Petition For Order Authorizing Transfer Of Funds From Oppenheimer & Co. To Restricted Depository at Gibraltar Bank For Additional Payments *915 to Limited Guardian Of Person and Property (4/21/2011).
(2) Petition For Order Authorizing Transfer Of Funds From Oppenheimer & Co. To Restricted Depository At Gibraltar Bank For Periodic Payments To Limited Guardian Of Person And Property (4/27/2011, Amended 7/5/2011).
(3) Petition to Compel The Withdrawal Of Funds From Oppenheimer Account To Pay Court-Approved Retainers Of Guardian’s Counsel (5/26/2011).
Furthermore, on July 8, 2011, when the Ward’s liquid assets dipped to $15,000, the Guardian obtained another temporary injunction freezing the Oppenheimer Account pending the dispute’s resolution.
Irene’s response to the petitions was to attempt to block all access to the Oppenheimer Account by the Guardian on behalf of the Ward. Irene filed an omnibus objection to the Oppenheimer Account “being accessed for any purpose” until the court determined “the validity and application of the parties’ Prenuptial Agreement.” Enforcement of the prenuptial agreement as Irene desired would have left the Ward insolvent. Within her objection, Irene described the Oppenheimer Account as being “held as joint tenants with right of surviv-orship.”

The Budgetary Hearing

By August 2011, the Ward’s health had deteriorated significantly. On August 4, the trial court conducted a hearing to resolve, among other things, the Guardian’s petitions to access the Oppenheimer Account and a petition to approve an amended budget. Although not elaborated upon in detail, the trial court denied the Guardian’s petitions as they pertained to “the withdrawal of funds from the Oppenheimer Account to pay the court appointed retainers of [the] guardian’s counsel” and directed the parties to act with urgency in setting a hearing on the budgetary matter. In so doing, the trial court remarked:
Just from [Irene’s] point of view, regardless of her legal position she would be misguided if she thought I wasn’t going to allow th[e Oppenheimer Account to pay for [the Ward’s] necessities, pending the determination of what I’ll be determining about the account.
At the August 11, 2011 budgetary hearing, the Guardian testified that the Ward was in critical condition and required 24-hour nursing care, at a cost of about $11,000 per month. Finding that such costs were necessary for the Ward’s well-being, and that there were insufficient funds in the Ward’s unrestricted accounts to cover such expenses, the trial court orally ordered that this amount be withdrawn from the Oppenheimer Account along with $6,000 per month for Irene’s expenses. A written order was never entered. Less than a week later, on August 16, 2011, the Ward died.

Case No. 4D12-451

On September 19, 2011, the Guardian filed a petition seeking “use of the- Oppenheimer Account to pay guardianship administration expenses, and other expenses,[6] and finalize the guardianship proceedings after the death of the Ward.” In the petition, the Guardian averred that the Oppenheimer Account, as a joint tenancy with right of survivorship, was part of the Ward’s guardianship estate and thus could be accessed to pay the necessities of the Ward, including guardianship administration costs.

*916
The October Evidentiary Hearings

At an October 18-19 hearing, the Guardian introduced three exhibits: (1) a September 2011 statement for the Oppenheimer Account, which listed the account’s title as “Jack Olshen & Irene Olshen JTWROS”; (2) Oppenheimer and Company Standing Periodic ACH Instructions, dated December 3, 2010, providing for a $6,000 monthly withdrawal, which was signed on the “co-owner” lines by Irene and by the Guardian, on behalf of the Ward; and (3) the initial guardianship inventory, which included the Oppenheimer Account as its primary asset. In addition, the- Guardian testified that the funding for the Oppenheimer Account derived from the sale of the Ward’s solely owned business in 2010, and that withdrawal of funds required the signatures of both parties. On Irene’s cross examination, the Guardian disclaimed knowledge as to whether the Oppenheimer Account was a tenancy by the entireties between the Ward and Irene. Irene did not testify.
Among other things, the Guardian argued in closing that since a guardian of property is statutorily required to perform certain obligations following a ward’s death, Irene’s right of survivorship in the Oppenheimer Account should be encumbered by a lien for the guardianship administration fees.
In response, for the first time in the litigation, Irene took the position that the Oppenheimer Account was inaccessible to the Guardian as a tenancy by the entire-ties, unless Irene authorized payment for her husband’s expenses, which she did not. Furthermore, Irene argued that even if the account were a joint tenancy, Irene’s survivorship interest vested immediately upon the Ward’s death, extinguishing any claims, liens, or judgments against the Ward individually, so that the Oppenheimer Account could not be accessed to cover pre-death expenses of the Ward.

The Tnal Court’s 1/10/2012 Order

On January 10, 2012, the trial court entered a written order denying the Guardian’s petition on the grounds that, upon the Ward’s death, “the funds in the Oppenheimer [Ajccount became immediately [Irene’s] and were no longer available to pay guardianship expenses.” In support of this ruling, the trial court found that since the Ward and Irene were married at the time of the Ward’s death, and since the Oppenheimer Account “was titled in both of their names,” “they [we]re presumed to have held title[] as tenants by the entireties.” To make this ruling, the court applied the presumption described in Beal Bank, SSB v. Almand & Associates, 780 So.2d 45 (Fla.2001), upon which Irene had relied. Tacitly, the court adopted Irene’s view that the account was not available to pay the Ward’s expenses during his lifetime without Irene’s consent.
In reaching its decision, the trial court understandably expressed concern over the fairness of its ruling:
Candidly, this Court saw the equities in this dispute in favor of the guardian, who along with his attorney, performed exemplary service to the Ward. In this regard, the Court read and reviewed the plethora of law furnished by the parties and has done its own research, looking for a legal basis to preliminarily grant relief to the guardian so that, subject to the claims of [Irene,] the funds in the joint Oppenheimer [A]ccount could be used to pay for the remaining guardianship expenses.
Recognizing that there was pending litigation pertaining to the account, the court continued the freeze order on the account for an additional 60 days. This order is the subject of the appeal in Case No. 4D12-451.

*917
Case No. 4D12-2466

With the 60 day extension nearing expiration, the Guardian moved to continue the freeze on the Oppenheimer Account in February 2012. On March 20, the trial court granted the Guardian’s motion, finding that although the Oppenheimer Account became Irene’s upon the Ward’s death, “there were claims that accrued as of the date of the Ward’s death that are attributed to the guardianship of the Ward, including fees and expenses of the Guardian and Counsel.” Accordingly, “notwithstanding that the Oppenheimer [A]ccount was no longer an asset of the guardianship upon the death of the Ward,” the trial court ruled that “the funds therein may be used to pay for the[ ] pre-death expenses of the Ward.”
With the freeze in place, appellee Goldberg petitioned the court for authorization to use the Oppenheimer Account to pay for the attorney’s fee it was awarded prior to the Ward’s death. Irene objected to any invasion of the Oppenheimer Account, arguing that: (1) the account is a tenancy by the entireties, and thus inaccessible; (2) guardian and attorney’s fees are not necessities of the Ward, and thus may not be obtained from a joint account; and (3) the account passed to Irene through her right of survivorship.
Following a May 10, 2012 hearing, the trial court permitted appellee Goldberg to recover fees from the Oppenheimer Account. Along with finding the fees “necessary” for the guardianship’s administration, the trial court elaborated:
If the system was one that the guardian — the attorney for the guardian could have come into Court the following week during [the Wardj’s lifetime and [gotten] a hearing, then it would have been heard during the time that [the Ward] was still alive before he died and the account went over all to Irene.
And so I’m looking at the date of the order of entitlement as being the critical date because I just have to then determine where it’s coming from.So I think that the entitlement equitably and legally for this expense is appropriate.
The trial court’s written order effectuating this oral pronouncement is the subject of Case No. 4D12-2466.

Case No. 4D13-1083

Prior to the order on appellee Goldberg’s motion, on March 23, 2012, the Guardian moved to (1) determine other claims and expenses of the guardianship that remained unpaid and (2) identify the source of funds for payment. In October 2012, the trial court awarded numerous “expenses of the Guardianship that accrued during the Ward’s lifetime,” including nursing care fees, funeral expenses, and other debts of the sort. Upon the Guardian’s motion, the trial court entered an order approving payment of the expenses from the frozen Oppenheimer Account. That order is the subject of Case No. 4D13-1083.
Of the three orders on appeal, the latter two are in conflict with the first, since they authorize payment from the Oppenheimer account for fees and expenses incurred prior to the Ward’s death.

Legal Analysis

The legal issues in this case arise at the intersection where guardianship law meets the law concerning forms of ownership of joint bank or brokerage accounts. Because the Oppenheimer Account is properly viewed as a joint tenancy with right of survivorship, Chapter 744 permits the trial court to authorize payments for the Ward’s necessary expenses after his death.

Guardianship as an Equitable Proceeding

The “overwhelming” public policy of guardianship law “is the protection of *918 the ward.” Hayes v. Guardianship of Thompson, 952 So.2d 498, 505 (Fla.2006). Part of the expressed legislative intent of Chapter 744 is to assist a ward “in meeting the essential requirements for [his] physical health and safety, in protecting [his] rights, in managing [his] financial resources, and in developing or regaining [his] abilities to the maximum extent possible.” § 744.1012, Fla. Stat. (2012). Chapter 744 is to be “liberally construed to accomplish this purpose.” Id. Although not true in this case, generally, “guardianship proceedings are not adversarial and are governed by a comprehensive statutory code.” Hayes, 952 So.2d at 505.
The ability of a court to effectuate the public policy of protecting the ward is enhanced by a guardianship’s status as an equitable proceeding. “Historically, courts of equity came into being in order to provide a forum for the granting of relief in accordance with the broad principles of right and justice in cases where the restrictive technicalities of the law prevented the giving of relief.” Hedges v. Lysek, 84 So.2d 28, 31 (Fla.1955). “Equity is a court of conscience; it demands fair dealing in all who seek relief, and requires decency, good faith, fairness, and justice. Equity cannot be invoked for selfish or ulterior purposes.” Epstein v. Epstein, 915 So.2d 1272, 1275 (Fla. 4th DCA 2005) (quoting Schetter v. Schetter, 279 So.2d 58, 61 (Fla. 4th DCA 1973) (Walden, J., dissenting)).
As courts of equity, guardianship courts are “charged with the responsibility of protecting an incompetent and his property.” Cohen v. Cohen, 346 So.2d 1047, 1048 (Fla. 2d DCA 1977) (citing Am. Surety Co. v. Andrews, 152 Fla. 638, 12 So.2d 599 (1943)); see also In re Nusbaum’s Guardianship, 152 Fla. 31, 10 So.2d 661, 663 (1942) (stating that a guardian’s acts are “always open to the rigid scrutiny of courts of equity” (citations omitted)); In re Estate of Howard, 542 So.2d 395, 397 (Fla. 1st DCA 1989). Guardianship courts “have wide discretion in fashioning remedies to satisfy the exigencies of the circumstances.” Schroeder v. Gebhart, 825 So.2d 442, 446 (Fla. 5th DCA 2002) (citing Singer v. Tobin, 201 So.2d 799, 800-01 (Fla. 3d DCA 1967)). Thus, a court of equity is authorized to expansively construe Chapter 744 to protect the interests of a ward.

Chapter Framework for Guardian of Property

Under Chapter 744, a guardian has broad powers to access a ward’s assets to act in the ward’s best interest. A guardian is a person “appointed by the court to act on behalf of a ward’s person or property, or both.” § 744.102(9), Fla. Stat. (2012). The guardian of a ward’s person “exercise[s] the rights of the ward that have been [so] delegated,” In re Guardianship of Sapp, 868 So.2d 687, 697 (Fla. 2d DCA 2004), and is discharged upon the filing of the ward’s death certificate. See § 744.521, Fla. Stat. (2012); Fla. Prob. R. 5.680(a). The guardian of the ward’s property, on the other hand, is entrusted with protecting and preserving the ward’s property, performing all duties required of him or her by law, and delivering, upon termination of the guardianship, all property to those so entitled. See § 744.361(6)(a)-(c), Fla. Stat. (2012).
A guardian of the property of a ward shall “[p]rotect and preserve the property and invest it prudently[,] ... apply it as provided in s. 744.397, and account for it faithfully.” § 744.361(6)(a), Fla. Stat. (2012). A court may authorize a guardian of property to “apply the ward’s income” to the “ward’s care, support, education, and maintenance”; “[i]f the income is not sufficient for these purposes, the court may authorize the expenditure of part of *919 the principal for such purposes from time to time.” § 744.397(1), Fla. Stat. (2012).
For the performance of these duties, the guardian and the guardian’s attorneys are “entitled to a reasonable fee for services rendered and reimbursement for costs incurred on behalf of the ward.” § 744.108(1), Fla. Stat. (2012). Such fees are “determined by the court and paid from the assets of the guardianship estate,” § 744.108(8), Fla. Stat. (2012), where the “guardianship estate” includes “the property of [the] ward subject to administration.” § 744.102(7), Fla. Stat. (2012).

The Oppenheimer Account Is a Joint Tenancy with Right of Survivorship

The circuit court’s January 10, 2012 order relied on the presumption created by Beal Bank, 780 So.2d at 48-58, to conclude that the Oppenheimer Account was a tenancy by the entireties. In Beal Bank, the Supreme Court held in part
that as between the debtor and a third-party creditor (other than the financial institution into which the deposits have been made), if the signature card of the account does not expressly disclaim the tenancy by the entireties form of ownership, a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time and with right of survivorship.
Id. at 58 (emphasis added).
The designation of the account as a tenancy by the entireties was significant in this case because, where the ward is an incapacitated spouse, Chapter 744 appears to condition access to an entireties account on the consent of the spouse who is not incapacitated. Section 744.457(l)(a), Florida Statutes (2012), provides that
[a]ll legal or equitable interests in property owned as an estate by the entirety by an incapacitated person for whom a guardian of the property has been appointed may be sold, transferred, conveyed, or mortgaged in accordance with s. 744.447, if the spouse who is not incapacitated joins in the sale, transfer, conveyance, or mortgage of the property.
(Emphasis added). Without the application of some equitable principle that would override the language of the statute, an estranged spouse would be able to block payment of a ward’s necessary expenses under section 744.457(l)(a), even though the ward was the source of the funds in the account and even though each spouse is “seized of the whole” of property held in a tenancy by the entireties account. Beal Bank, 780 So.2d at 53.
We need not address this conundrum with an equitable escape hatch because the trial court erred in relying on the Beal Bank presumption to find that the Oppenheimer Account was a tenancy by the entireties. The clear language of Beal Bank makes the presumption applicable only in a proceeding between a third-party creditor and the husband or wife as a debtor. Id. at 48-58. No such presumption applies in a guardianship proceeding or in a lawsuit where the husband and wife are opposing parties.
Absent the presumption, the only evidence here was that the Oppenheimer Account was a joint tenancy with right of survivorship: (1) the account was entitled: “Jack Olshen & Irene Olshen JTWROS”— an acronym for joint tenants with right of survivorship; (2) in her objection to the Guardian’s petitions for payment, Irene described the account as being “held as joint tenants with right of survivorship,” and (3) the account was funded by the proceeds of the Ward’s sale of his premari *920 tal business and it would be unusual to place the funds in an account where the Ward did not have the right to his individual interest in the account. Irene did not testify or offer any contrary evidence.
Because the Oppenheimer Account was a joint tenancy with right of survivorship, the court could authorize the Guardian to access it to pay authorized expenses, including the Guardian’s fee and the fees for the Guardian’s attorneys. See §§ 744.397(1), 744.457(l)(b), Fla. Stat. (2012). “In a joint tenancy with right of survivorship, each person has only his or her own separate share (‘per my’), which share is presumed to be equal for purposes of alienation.” Beal Bank, 780 So.2d at 53. In such an account, “each tenant ‘has the right, against the other, only to his or her individual interest in the account’ during the lifetime of the joint tenants; funds in the account belong to the parties in proportion to the net contributions by each to the sums on deposit.” Joseph v. Chanin, 940 So.2d 483, 486 (Fla. 4th DCA 2006) (quoting Nationsbank v. Coastal Utils., Inc., 814 So.2d 1227, 1229 (Fla. 4th DCA 2002)). A guardian may properly make withdrawals from a joint account with right of survivorship for a “ward’s necessities.” Drozinski v. Straub, 383 So.2d 301, 304 (Fla. 2d DCA 1980). Such necessities include the professional fees necessary to maintain the guardianship.

The Death of the Ward Did Not Terminate the Guardian’s Access To the Oppenheimer Account

We disagree with Irene that the Guardian lost all ability to access the Oppenheimer Account once the Ward died. It is true that ownership of the account passed to Irene upon the Ward’s death, but Chapter 744 requires a guardian of property to perform tasks related to the guardianship after the death of the ward. Along with these post-death obligations, the Guardian retained “possession” of the account within the meaning of section 744.527(2) for the purpose of winding up the guardianship. It is as if Chapter 744 created a tacit equitable lien on a survivor-ship account to pay legitimate expenses of the guardianship.
Chapter 744 contemplates that a guardian will perform services and be able to access the guardianship estate even after the death of the ward. The guardian of property is not discharged upon the ward’s death, but must continue the administration until a petition for discharge is granted and his or her final accounting is approved. See § 744.531, Fla. Stat. (2012). Section 744.441(16), Florida Statutes (2012), allows a guardian, with court approval, to pay “reasonable funeral, interment, and grave marker expenses for the ward from the ward’s estate, up to a maximum of $6,000.” Upon applying for discharge, the guardian may also “retain from the funds in his or her possession a sufficient amount to pay the final costs of administration, including guardian and attorney’s fees regardless of the death of the ward, accruing between the filing of his or her final returns and the order of discharge.” § 744.527(2), Fla. Stat. (2012); Fla. Prob. R. 5.680(b)(3). The trial court was therefore authorized to approve the Guardian’s request for payments from the Oppenheimer Account.
If the ward’s death rendered a survivor-ship account inaccessible to a guardian of property, then serving as a guardian or the guardian’s attorney would be a risky financial proposition. Many wards are in frail health and a guardian’s compensation should not require a race to the courthouse to secure a court order prior to a ward’s death. Severe restrictions on access to survivorship accounts that are part of the guardianship estate would deter many *921 qualified persons from serving as guardians, a result contrary to the public purpose of protecting wards. Chapter 744 should be construed liberally to ensure a compensation framework that encourages competent, qualified guardians to serve. See § 744.1012, Fla. Stat. (2012).[7]

The Legislature Should Consider Amending Section 7kh-h57(l)(a) to Allow Access to a Tenancy By the Entireties Bank or Brokerage Account for the Necessary Expenses of the Ward, Even Where the Spouse of the Ward Does Not Agree

Although not crucial to the decision in this case, section 744.457(l)(a) could be read to block a guardian’s access to an entireties bank or brokerage account without the consent of a ward’s non-incapacitated spouse. The section is broadly written to apply to “[a]ll legal or equitable interests in property owned as an estate by the entireties”; it provides that such interests in property may not be “sold transferred, conveyed, or mortgaged” unless “the spouse who is not incapacitated joins in the sale, transfer, conveyance, or mortgage of the property.” § 744.457(l)(a), Fla. Stat. (2012). Most likely, the statute was drafted with real property in mind and not bank or brokerage accounts. The statute is consistent with the Florida view of entireties ownership, that the husband and wife hold the property “per tout,” Bailey v. Smith, 89 Fla. 803, 103 So. 833, 834 (1925), such that both are treated as one person and “neither spouse can sell, forfeit, or encumber any part of the estate without the consent of the other.” Douglass v. Jones, 422 So.2d 352, 355 (Fla. 5th DCA 1982) (citations omitted).
In a situation such as this one, where a divorce is pending and the spouses are at odds, one spouse could undermine the purpose of guardianship law to deprive the ward/spouse of funds to cover necessary living expenses. It seems stunningly unfair to deprive a ward of funds of which he or she is clearly an owner. Moreover, spouses owe each other a duty of support “imposed by statute.” Fernandez v. Fernandez, 710 So.2d 223 (Fla. 2d DCA 1998); see also §§ 61.071, 61.08, 61.09, Fla. Stat. (2012); Lashkajani v. Lashkajani, 911 So.2d 1154, 1158 (Fla.2005) (recognizing “the continuing obligations of support [between spouses] before the marriage is dissolved”).
The purpose of the mandatory abatement of the dissolution proceeding under section 61.052(l)(b), which went into effect in this case, was to enforce the “legislature’s continued concern for the protection of incompetents” by “compelling” the competent spouse “to provide for the care and maintenance” of the incompetent spouse. Goldberg v. Goldberg, 643 So.2d 656, 658 (Fla. 4th DCA 1994). Absent the guard *922 ianship, Chapter 61 would have required access to the entireties account for necessary support. Yet, the Chapter 61 dissolution is stayed by the guardianship, supposedly to protect the ward. This created a Catch-22 situation where Irene attempted to use Chapter 744, designed to protect a ward, entirely to the ward’s detriment. Where spouses are prevented from divorcing by section 61.052’s abatement provision, for a spouse to deny an incapacitated spouse access to an entireties account for necessary expenses is to violate the clear duty of support imposed by Florida law and the public policy to protect the ward that is at the heart of guardianship law.
In light of this obligation of one spouse to another, the Legislature should authorize a court to allow access to an entireties bank or brokerage account for necessary guardianship expenses, even if the spouse of the ward does not agree. In the absence of legislative action, in the appropriate case, a court might well use equitable principles to achieve a just result. See Bencomo v. Bencomo, 195 So.2d 874, 875 (Fla. 3d DCA 1967) (“[EJquitable relief may be granted [to] a co-tenant by the entireties in cases of conflicting interests.” (footnote omitted)); Lacker v. Zuern, 109 So.2d 180, 182 (Fla. 2d DCA 1959) (recognizing the possibility of “granting equitable relief against a-husband, cotenant by the entireties, where he [wa]s draining off the profits arising from the property so held, and impairing the corpus”).
For the reasons stated above, we reverse the order in Case No. 4D12-451, affirm the orders in Case Numbers 4D12-2466 and 4D13-1083, and remand to the circuit court for further proceedings.
WARNER and CONNER, JJ., concur.

. This case concerns petitions to access the Oppenheimer Account into which the proceeds of the sale were deposited. While these petitions were pending, on July 21, 2011, the Guardian and Olshen Overseas, Inc. petitioned to revoke the Oppenheimer Account on the grounds that it was created at a time when the Ward "lacked the capacity to contract.” Specifically, the petition alleged that prior to February 1, 2010, "the Ward's mental and physical health ... declined precipitously” to the point he "began to display uncharacteristic behavior” and could no longer "comprehend the general nature and extent of his assets.” According to the petition, with the Ward’s mental state so weakened, Irene then “took over control of the Ward's personal and business affairs,” culminating when she "improperly presented herself as a corporate officer” and “facilitated the sale of the Ward’s solely owned business assets” to create the Oppenheimer Account. The lawsuit also sought (1) injunctive relief to prevent Irene from receiving the proceeds from the sale of the Ward’s business, (2) recovery for unjust enrichment resulting from Irene’s noncompliance with court orders, (3) damages for breach of fiduciary duty, and (4) other relief. This petition was later stayed by a November 30, 2011 order and remains unresolved today. Since the guardianship must terminate as a result of the death of the Ward, this lawsuit must be pursued, if at all, by the Ward's estate.

. Section 744.334, Florida Statutes (2012), provides that every petition for the appointment of a guardian "shall contain statements, to the best of petitioner’s knowledge and belief, showing,” inter alia, "the nature and value of property subject to the guardianship.”

. See § 744.102(17), Fla. Stat. (2012) (defining "professional guardian”); see also §§ 744.1083, 744.1085, Fla. Stat. (2012) (involving the registration and regulation of professional guardians).

.Section 6i.052(l)(b), Florida Statutes (2012), provides that "no dissolution shall be allowed unless the party alleged to be incapacitated shall have been adjudged incapacitated according to the provisions of s. 744.331 for a preceding period of at least 3 years.”

. Such expenses included the unpaid fees of the Guardian, his attorneys, and other professionals hired by the Guardian for the services they performed for the benefit and protection of the Ward during his lifetime.

. We note that in setting a "reasonable fee” under section 744.108(1), Florida Statutes (2012), the guardianship court’s broad equitable powers include the ability to take into consideration the extent to which proposed fees deplete the guardianship estate. Thus, section 744.108(2)(e) requires a court to consider, among other things, the "nature and value of the incapacitated person's property [and] the amount of income earned by the estate”; section 744.108(2)(g) makes the "time limits imposed by the circumstances” another relevant factor for consideration. A guardianship court’s discretion "includes the ability to rely on common sense and experience to adjust the time claimed for common or routine tasks” and to "deduct excess time claimed due to the guardian's own inefficiency.” In re Guardianship of Shell, 978 So.2d 885, 889 (Fla. 2d DCA 2008). Chapter 744 thus takes a holistic approach to setting a reasonable fee similar to that described by the Supreme Court for Chapter 61 proceedings in Rosen v. Rosen, 696 So.2d 697, 701 (Fla. 1997) (holding that “a court may consider all the circumstances surrounding the suit in awarding fees under section 61.16”).