825 So.2d 442 (2002)
Lynda Russell SCHROEDER and Mark Stenstrom, et al., Appellant/Cross-Appellee,
v.
Steven Thomas GEBHART and Eric Daniel Gebhart, Appellee/Cross-Appellant.
No. 5D01-2777.
District Court of Appeal of Florida, Fifth District.
July 19, 2002.
Rehearing Denied September 13, 2002.
Michael S. Herring of Michael S. Herring, P.A., Sanford, for Appellant/Cross-Appellee.
Michael D. Jones of Leffler & Associates, P.A., Winter Springs, for Appellee/Cross-Appellant.
ORFINGER, R.B., J.
Lynda Russell Schroeder (Lynda), Mark Stenstrom (Mark), Deborah Susan Russell *443 Bowman (Debbie), and Jeffrey Thomas Russell (Butch) appeal a final judgment reforming an inter vivos trust following the death of the settlor. The trial court found that the testamentary aspects of the Eleanor C. Russell inter vivos trust contained a drafting mistake causing the trust agreement to inaccurately reflect the settlor's intentions. The court reformed the trust agreement to include Steven Thomas Gebhart (Steven) and Eric Daniel Gebhart (Daniel) as beneficiaries of the trust along with Lynda, Debbie, and Butch. Steven and Daniel cross-appeal the trial court's refusal to impose a constructive trust on certain trust assets. We affirm.
To understand the present dispute, one must have an understanding of the Russell family tree. Eleanor C. Russell (Eleanor), the settlor of the trust, had one son, Joe Thomas Russell (Tommy). Tommy had two biological sons, Steven and Daniel, with his first wife. After Tommy divorced Steven and Daniel's mother, she married William Gebhart who, with Tommy's consent, adopted Steven and Daniel (the "Gebharts" or the "adopted out" children). Tommy later remarried and subsequently adopted his second wife's children, Lynda, Debbie, and Butch (the "Russells" or the "adopted in" children).
In 1989, Eleanor consulted attorney Faith K. Stalnaker for estate planning purposes. At Eleanor's direction, Stalnaker drafted a trust agreement which Eleanor executed. The trust agreement made Eleanor the settlor, trustee, and sole beneficiary during her lifetime. The trust agreement further provided that upon Eleanor's death, all remaining assets would be distributed to "Joe Thomas Russell [Tommy], per stirpes." Tommy died in 1992, and when Eleanor died in 2000, a dispute arose between the Russells and the Gebharts regarding who were the beneficiaries of the trust. The Russells maintained that because Tommy had adopted them, they were his legal heirs, and that the Gebharts, the adopted out children, were no longer a part of Tommy's lineage. The Gebharts maintained that Eleanor intended that they have the ranch and a fish camp, which comprised a substantial part of the trust assets, and that the trust agreement failed to reflect her true intent. As a result of the dispute, the adopted out children filed suit, seeking, among other things, to impose a constructive trust on the ranch and fish camp, based in part on the claim that the trust agreement contained a drafting error.
The evidence at trial demonstrated that both the adopted in and the adopted out children had a continuing and relatively close relationship with Eleanor. While there was conflicting testimony at trial regarding Eleanor's intent to include all, or some of the adopted in and adopted out children in the trust in the event that Tommy predeceased her, the most relevant testimony regarding her intentions and the trust drafting process came from Stalnaker, the attorney who drafted the trust agreement. In pertinent part, Stalnaker testified as follows:
I asked her [Eleanor] who do you what [sic] to get your estate if Tommy dies before you do and she says his children. And I start writing them down and I said who are they, and she named two of them, and then Tommy says well, I have five, and I said well, you want to give me all their names? He says no. I said, well, it wasn't necessary, I'll just put per stirpes, that means your lineal descendants. And that's exactly what happened.
Q. There was noYou didn't ask them if therehad anyone been adopted in or out of the family?
A. I wished to goodness I had but I didn't.

*444 Q. I understand.
A. I wish I had but I didn't, and I didn't know that there were any adoptions at all until much much later.
* * *
Q. Did you have your file with you, did you jot down the names of all five children in your file?
A. No. He never gave them to me, never, but I did jot down two. I jottedand that's why I did the affidavit that I jotted down because Eleanor was telling me Steve and Daniel, I think.
Q. Steven and Daniel were specifically mentioned?
A. Yeah. I've got that written down somewhere if I can ever find it.
Q. I know that's in your affidavit.
A. Yeah, well, that's true.
Q. Okay.
A. To the best of my recollection and my notes.
* * *
Q. You do specificallyto back track you do specifically recall when you had the initial meeting back in 1989 with Eleanor round about September of '89 that she specifically mentioned Steve or Steven and Daniel as being her grandchildren?
A. Yeah. Now that's Eleanor, that's not Tommy.
Q. Eleanor?
A. Eleanor did. And I've got notes somewhere in here where I wrote it down.
Q. You wrote the two kids' names down.
A. Yeah.
Q. And did you date the notes if you can recall?
A. Yeah, they are dated.
Q. Are they in shorthand? Are they legible?
A. I think so.
Q. Okay.
A. I think so. I'm trying to find them on the yellow sheets. No. I hadI had something in front of me when I did the affidavit but I don't know which file it was in. It may be in Tommy's file because they came to see me together. They never came to see me apart. And the only time I ever saw Eleanor by myself when I asked Tommy to leave the room so I wanted to make sure she understood.
I'll find it. I don't have it. It's got to be in Tommy's file.
* * *
Q. Did you write down both names, first and last name, or did you
A. No. Just if I remember right I looked at it recently it was Steven, Daniel.
Q. Steve and Dan?
A. Uh-huh.
The trial court found that Stalnaker was unaware at the time she drafted the trust agreement that Steven and Daniel had been adopted out, and Lynda, Debbie, and Butch had been adopted in. As a result, Stalnaker and Eleanor erroneously assumed that any disposition to Tommy per stirpes would, in the event Tommy predeceased Eleanor, pass to all five children.
Although the parties raise numerous issues on appeal, we write to address only two: (1) whether the testamentary aspects of an inter vivos trust are subject to reformation after the death of the settlor in the event of a unilateral drafting error; and, (2) whether the court can properly reform the trust when reformation was not sought.
*445 As the trial court found, the term "per stirpes" is unambiguous, and when applied to the facts of this case, has the legal effect of excluding the adopted out children. See § 63.172, Fla. Stat. (2000).[1] But our analysis cannot stop there. We must decide whether a trust can be reformed after the death of the settlor if clear and convincing evidence demonstrates a unilateral drafting error. The Fourth District Court of Appeal answered that question in In re Estate of Robinson, 720 So.2d 540 (Fla. 4th DCA 1998), when it held that "a trust with testamentary aspects may be reformed after the death of the settlor for a unilateral drafting mistake so long as the reformation is not contrary to the interest of the settlor." Id. at 543. The thorough analysis set forth by the court in Robinson is sound, and is hereby adopted. See also In re Estate of Huls, 732 So.2d 1206 (Fla. 2d DCA 1999).
Allowing a court to reform an inter vivos trust after the death of the settlor is consistent with general equitable principles well-established in Florida and other states. It has long been held that equity will reform an agreement so as to conform to the intent of the parties, when an agreement, which due to a mistake of the drafter, violates or fails to carry out the intention of the parties. Relief is given where, through a mistake of the scrivener, the instrument contains an error or fails to properly define the terms agreed to by the parties. Steffens v. Steffens, 422 So.2d 963, 964 (Fla. 4th DCA 1982). That principle, which applies generally to bilateral contracts supported by mutual consideration, should certainly apply to a unilateral trust agreement, not supported by consideration given by the competing beneficiaries.
Other states have reached similar conclusions. In Shoemaker v. Estate of Freeman, 967 P.2d 871 (Okla.1998), the Supreme Court of Oklahoma explained:
¶ 19 An exception to the general rule requiring mutual mistake or unilateral mistake and fraud is where the trustor of a trust does not receive any consideration for creating the trust. Where there is no consideration for the creation of the trust, unilateral mistake on the part of the trustor is usually a sufficient ground for reformation. Restatement (Second) of Trusts § 333 cmt. e (1959); 4 Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts *446 § 333.4 (1989); see Green v. Votaw, 192 Okla. 136, 134 P.2d 367, 371 (1943)....
¶ 20 Even though a unilateral mistake is a sufficient ground for reforming a trust which was created without any consideration, the burden is nonetheless on the party seeking reformation to establish by clear-and-convincing evidence the mistake. Griffin [v. Griffin], 1992 OK 36, ¶ 15, 832 P.2d [810] at 813. The purpose of reformation for a mistake is to assure that the intent of the trustor is carried out. See id. at ¶ 16, 832 P.2d at 813. Thus, the mistake must be material and the party seeking reformation must establish that the trust as written does not reflect the trustor's intent or that the trustor would have used different terms but for the mistake.
¶ 21 The remedy of reformation is equitable. Thompson v. Estate of H.H. Coffield, 1995 OK 16, ¶ 10, 894 P.2d 1065, 1068. In an action of equitable cognizance, this Court will not disturb the trial court's findings unless they are clearly contrary to the weight of the evidence. Pine Island RV Resort, Inc. v. Resort Management, Inc., 1996 OK 83, ¶ 18, 922 P.2d 609, 613.
Id. at 876. See also Pond v. Pond, 424 Mass. 894, 678 N.E.2d 1321 (1997); Roos v. Roos, 203 A.2d 140 (Del.Ch.1964).
In light of considerable authority, we have no difficulty in concluding that Eleanor's trust was subject to reformation. Reformation is an equitable remedy designed to correct a defective or erroneous instrument so that it reflects the true agreement of the party (in a case such as this) or parties. See Chanrai Invs., Inc. v. Clement, 566 So.2d 838 (Fla. 5th DCA 1990). That is precisely what the trial court did here.[2]
We next consider whether the trial court properly granted reformation when that relief was not requested in the pleadings. The complaint filed by the Gebharts sought the imposition of a constructive trust on certain trust assets, not reformation. The trial court found ample evidence that Eleanor intended both the adopted in and adopted out children to be beneficiaries of the trust, in the event Tommy predeceased her. However, the trial court found unpersuasive the testimony concerning Eleanor's desire to see the ranch and fish camp pass solely to the Gebharts.
Once a court of equity acquires jurisdiction over a dispute, it is authorized to administer full, complete and final relief. Cook v. Lee, 290 So.2d 65, 66 (Fla. 3d DCA 1974). Generally, courts of equity have wide discretion in fashioning remedies to satisfy the exigencies of the circumstances. Singer v. Tobin, 201 So.2d 799, 800-01 (Fla. 3d DCA 1967). We conclude that the trial court, sitting as a court of equity, had the authority to reform the trust, although reformation was not sought. A court of equity "should not be shackled by rigid rules of procedure and thereby preclude justice being administered according to good conscience." Wicker v. Bd. of Pub. Instruction of Dade County, 106 So.2d 550, 558 (Fla.1958) (quoting Degge v. First State Bank of Eustis, 145 Fla. 438, 199 So. 564, 565 (1941)).
Finding no error in the other issues raised by the parties, the final judgment of the trial court is affirmed.
AFFIRMED.
COBB and PALMER, JJ., concur.
NOTES
[1] Section 63.172, Florida Statutes provides:

(1) A judgment of adoption, whether entered by a court of this state, another state, or of any other place, has the following effect:
(a) It relieves the birth parents of the adopted person, except a birth parent who is a petitioner or who is married to a petitioner, of all parental rights and responsibilities.
(b) It terminates all legal relationships between the adopted person and the adopted person's relatives, including the birth parents, except a birth parent who is a petitioner or who is married to a petitioner, so that the adopted person thereafter is a stranger to his or her former relatives for all purposes, including inheritance and the interpretation or construction of documents, statutes, and instruments, whether executed before or after entry of the adoption judgment, that do not expressly include the adopted person by name or by some designation not based on a parent and child or blood relationship.
(c) It creates the relationship between the adopted person and the petitioner and all relatives of the petitioner that would have existed if the adopted person were a blood descendant of the petitioner born within wedlock. This relationship shall be created for all purposes, including inheritance and applicability of statutes, documents, and instruments, whether executed before or after entry of the adoption judgment, that do not expressly exclude an adopted person from their operation or effect.
[2] This rule is, of course, limited to situations where reformation is not contrary to the interest of the settlor. Robinson, 720 So.2d at 543.