DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PARK CROSSING HOMEOWNERS ASSOCIATION, INC.,**
Appellant,

v.

**IVONNE SUAREZ** and **DIEGO SUAREZ**,
individually and on behalf of their son, **GABRIEL SUAREZ,**
Appellees.

No. 4D2023-3116

---

**IVONNE SUAREZ** and **DIEGO SUAREZ**,
individually and on behalf of their son, **GABRIEL SUAREZ,**
Appellants,

v.

**PARK CROSSING HOMEOWNERS ASSOCIATION, INC.,** and
**MARTHA FERNANDEZ,**
Appellees.

No. 4D2024-0170

[April 30, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michele Towbin Singer, Judge; L.T. Case No. CACE18-008348.

Patrick Dervishi of Shir Law Group, P.A., Boca Raton, for appellant/appellee Park Crossing Homeowners Association, Inc., and appellee Martha Fernandez.

Leigh C. Markowitz, Matthew W. Dietz, and Talhia S. Rangel of Disability Inclusion and Advocacy Law Clinic, Shepard Broad College of Law, Nova Southeastern University, Fort Lauderdale, for appellees/appellants Ivonne Suarez, Diego Suarez, and Gabriel Suarez.

Kevin S. Rabin of Three Rivers Legal Services, Inc., Gainesville, and Katherine M. Hanson of Disability Rights Florida, Inc., for amici curiae Florida Housing Umbrella Group and Disability Rights Florida, Inc., in support of appellees/appellants Ivonne Suarez, Diego Suarez, and Gabriel Suarez.

GROSS, J.

A federal statute prohibiting discrimination against the disabled in housing confronts homeowner association covenants designed to protect a member's "right to the undisturbed enjoyment of" a unit "which is inseparable from ownership of the property," a right that dates back to the common law. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 87, at p. 619 (5th ed. 1984). After a jury decided contested fact issues in the association's favor, the circuit judge entered an injunction that threaded the legal needle. We affirm the orders on appeal in all respects but one—we reverse the trial court's order granting a new trial on the Federal Housing Act claim in Count I of the counterclaim.

## *Background*

This case arises out of a homeowners' association's efforts to abate loud noises caused by an autistic resident.

The Park Crossing Homeowners Association (the "Association") governs a community of multi-unit attached townhomes. The Association acts through its Board of Directors.

In 2003, Ivonne and Diego Suarez ("Ms. Suarez" and "Mr. Suarez," respectively) moved into a townhome in the Park Crossing community ("the Property" or the "Suarez home"). Ms. Suarez was the buyer of the Property. The Suarezes divorced less than a year after moving into the home. Ms. Suarez still owns the Property under her name.

The Suarezes' adult son, Gabriel, was born in 1993. Gabriel has autism spectrum disorder, a condition characterized by social difficulties and restricted, repetitive behaviors. His diagnosis is consistent with severe autism. He is mostly nonverbal, uses short words, and talks to his father more than anyone else. He experiences meltdowns.

Because of his autism, Gabriel has a disability. He is also a large man— 6'1" and around 300 pounds.

2

In around 2015 or 2016, Mr. Suarez moved into the Property to care for Gabriel, while Ms. Suarez resided in a nearby home. Ms. Suarez had previously been Gabriel's primary caregiver. When Mr. Suarez took over caregiving responsibility, Gabriel was a 22-year-old adult who had aged out of the public school system.

Dr. Brian Udell began treating Gabriel in 2017 and prescribed various medications over time to help stabilize Gabriel's mood and behavior, adjusting regimens to manage side effects.

In February 2018, after the Suarezes began having problems with the Association, Gabriel enrolled in a state-funded adult day training program administered through the Agency for Persons with Disabilities ("APD"). The program, Three Hearts ADT, initially provided him services that included life-skills training for adults, but he would refuse to engage in the social component, and his attendance declined over time.

In November 2019, Three Hearts ADT sent Mr. Suarez a 30-day notification informing him that it could no longer provide services for Gabriel because its facility was not equipped for his needs. Among other things, the letter noted that Gabriel would kick holes in the walls.

Gabriel's APD support coordinator, Hugo Merino, also attempted to provide Gabriel with an in-home companion, but "it didn't really work." Still, Merino acknowledged that an in-home aide is a service that could be arranged "if the person cannot be left home alone."

Dr. Udell opined that socialization was not important for Gabriel at his age and that Gabriel should have no companions other than his father. The doctor explained: "[H]e's stuck in his own world. That's where he's lived for 30 years and nobody is going to get in there and change it. And the attempt at doing it gives him so much agitation, gives him so much anxiety that just the attempt would be counterproductive."

Gabriel thus spent much of his time home alone during the day while his father worked. Mr. Suarez monitored him via indoor cameras accessible through his smartphone. Gabriel mostly stayed indoors, venturing outside primarily to retrieve the mail or take out the garbage. One neighbor testified that she would sometimes see Gabriel going in and out of the car with his father, but he was not running around common areas.

Martha Fernandez, a member of the Association's board, resides immediately next door to the Property in an adjoining townhome that

3

shares common walls with the Suarez home. Another neighbor, Liorima Miller, occupies the unit on the opposite side of the Property.

Beginning as early as 2013 or 2014, and continuing in the years that followed, neighbors heard screaming, loud noises, banging, arguments, and fighting in the Suarez home. The noises increased when Ms. Suarez moved out and Mr. Suarez moved in. Gabriel and his father sometimes had physical fights outside. On one occasion in 2017, Gabriel threw rocks that damaged a neighbor's car, which Ms. Suarez paid to have repaired. Police responded to the Suarez property multiple times in 2016 and 2017. On one occasion, Gabriel was involuntarily detained under the Baker Act due to his aggressive behavior.

Ms. Miller testified that, at times, she resorted to using a sound machine in her home to block Gabriel's noise. She complained about the noise in a written letter to the Association, which she gave to Ms. Fernandez.

Ms. Miller testified that Gabriel had taken her mail for a few days. She noted that other neighbors were also having issues with Gabriel taking their mail. She explained that Mr. Suarez had told her that Gabriel gets very excited when he expects something in the mail, which was "why he checked all the mailboxes." She conceded that she had never seen Gabriel threaten anybody and had never seen him attack anyone other than his father.

Ms. Fernandez testified that she accommodated Mr. Suarez's request that she give Gabriel space and avoid making eye contact with him. She testified that she would avoid going outside at the same time Gabriel went outside to get the mail or the garbage cans.

Because Ms. Fernandez was a board member, neighbors would express their concerns about Gabriel to her. The issue of the noise emanating from the Suarez residence was discussed at a board meeting around April 2017.

In April 2017, the Association sent a "Friendly Reminder Notice" to Ms. Suarez, informing her that the Association had received several complaints about loud screaming in the home. The Friendly Reminder Notice referenced the Association's regulation prohibiting disturbing noises and requested Ms. Suarez's "cooperation in correcting the above referenced matter."

The Friendly Reminder Notice did not succeed in stopping the noise.

### *The Association's Governing Documents and Chapter 720*

Article 10(F) of the Association's Declaration prohibits owners from making or permitting "any disturbing noises" or doing or permitting "anything that will interfere with the reasonable rights, comforts, or conveniences of other Owners." Article 14 of the Declaration provides that breaches "may be enjoined, abated or remedied by appropriate legal proceedings" by the Association.

Additionally, section 720.311(2), Florida Statutes (2017), requires the Association to offer pre-suit mediation before filing a lawsuit concerning a covenant-enforcement dispute.

### *The Section 720.311(2) Pre-Suit Mediation Demand*

Section 720.311(2)(a) sets out a lengthy form for a pre-suit mediation demand and states that an "aggrieved party shall serve on the responding party a written demand to participate in presuit mediation in substantially the following form." § 720.311(2)(a), Fla. Stat. (2017). The form requires an aggrieved party to list the "specific nature of the dispute or disputes to be mediated and the authority supporting a finding of a violation as to each dispute." *Id.* The bulk of the wordy statutory notice concerns the mechanics and procedures for the mediation process.

In November 2017, the Association's lawyer sent a pre-suit mediation request to the Suarezes containing language that went beyond what is contemplated by section 720.311(2)(a). The lawyer's notice included a demand that the Suarezes immediately arrange to have "proper care and supervision" for Gabriel at all times when he was at the Property or else the Association would demand that he be "permanently removed from the property" if the Suarezes could not mitigate the nuisance even with trained assistance.

The Suarezes did not attend the pre-suit mediation. The Board voted to authorize the filing of a lawsuit against them.

### *The Lawsuit*

In April 2018, the Association brought a two-count complaint against Mr. and Ms. Suarez, seeking: (1) a declaratory judgment that the Suarezes were in violation of the community's governing documents and Chapter 720; and (2) an injunction compelling the Suarezes to comply with the governing documents and Chapter 720.

The Suarezes filed an answer, affirmative defenses, and counterclaim. In their counterclaim, the Suarezes, individually and on behalf of Gabriel, sued both the Association and Ms. Fernandez, raising two counts under the Fair Housing Act ("FHA"): (1) denying or making a dwelling unavailable; and (2) failure to reasonably accommodate.

### *Events at Park Crossing During the Litigation*

The evidence showed that noises from the Suarez home continued during the litigation, but that the situation had improved somewhat. Ms. Miller testified at the 2022 trial that the noise problem was "not as bad" today but that she still hears it "once in a while." She testified she was not aware of any fights in the past year, and that she could not recall any incidents between 2020 and September 2022. In fact, she had "not really" seen Gabriel in the past two-and-a-half years, though she still hears him make noises. She arranged to have her mail delivered elsewhere.

Doreen Luaces, a neighbor, testified that since the end of February 2020, the yelling and banging had continued. She continued to hear noises coming from the Suarez home a couple of times per week.

Ms. Fernandez took video recordings of Gabriel in 2019 to "show what was going on." Specifically, in June 2019, Ms. Fernandez took videos of Gabriel making noises when he was getting out of the car, which were played for the jury. Ms. Fernandez testified that the noises were the same type of sounds that had come from the inside of the Suarez house. Mr. Suarez admitted that the noises are "sometimes" loud and last three or four seconds.

Ms. Fernandez testified that her videos of Gabriel did not go past 2019 and that she did not "have anything in 2020." Still, she was working from home in 2020 and heard a lot of noises during the day, which interrupted her. She testified that 2021 was "not hell," but was "not normal."

### *Jury Trial and Verdict*

A jury trial was held in September 2022. Count I of the Association's complaint (Declaratory Relief) was presented to the jury, while the circuit court reserved ruling on Count II (Injunctive Relief) until after the jury's verdict.

The evidence at trial established the facts set forth above. Additionally, Mr. Suarez admitted in his testimony that the Association had not stopped

him from accessing the Property. Ms. Fernandez testified that nobody should have to move from the community:

> Q. Let me ask this, should anybody have to move from the community?
>
> A. No.
>
> Q. Do you want them to move from the community?
>
> A. No, I don't.

Following the close of evidence and a lengthy discussion of 42 U.S.C. § 3604(f)(1) at the charge conference, the Association moved for a directed verdict on Count I of the Suarezes' counterclaim on the ground that they "have to be within the sale or rental" for the statute to apply. The trial court granted the motion, reasoning that the Suarezes had not presented any evidence that they were "either sellers or buyers or lessees or lessors that would bring them within the statute."

The jury returned a verdict in the Association's favor on Count I of its complaint and on Count II of the Suarezes' counterclaim, making the factual finding that the Suarezes had not requested a reasonable accommodation.

On the Association's claim for declaratory relief, the jury found that the Suarezes had violated Article 10(F) of the Declaration and Chapter 720 by permitting disturbing noises or interfering with the reasonable rights of other owners.

### *Association's Request for Injunctive Relief*

After the verdict, the circuit court conducted further proceedings regarding the Association's request for injunctive relief. The Association proposed various remedies, such as placing Gabriel in a day program or hiring a one-on-one companion. The Association also noted that another option discussed during trial was the soundproofing of the interior of the Suarezes' home, but the Association acknowledged that this was a "sticking point" with the Suarezes.

The Suarezes opposed the Association's motion, arguing that the verdict on the declaratory relief count did not obviate the need to prove the required elements of an injunction, and the Association had failed to meet its burden as to each of those elements.

7

Both sides filed affidavits addressing the status of the neighborhood, including affidavits concerning Gabriel's continued noises and mail interference. The Suarezes also filed a letter showing that Gabriel had been approved to receive personal support services from Monday through Friday in the afternoons.

### *The Injunctions*

The circuit court entered an order granting the Association's motion for an injunction. The court noted the jury's finding that the Suarezes had violated section 10(F) of the Declaration, but the court also made an independent finding to this effect. The court found that Gabriel "is making loud noises inside the Townhouse which disturb other townhouse residents" and had "also been opening the mailboxes of other townhouse owners and taking their mail." The court further found that the necessary prerequisites for injunctive relief had been met.

In October 2023, the court ordered that: (1) "[t]he parties confer to see if they can agree on the wording of the injunction that would prevent noise from the Townhouse from being heard by neighbors in their townhouses," with the court initially suggesting the following language: "Ivonne Suarez, as owner of the Townhouse, shall prohibit noises from inside her Townhouse that are loud enough to be heard by people in adjoining townhouses as well as the townhouses across the street"; (2) "Ivonne Suarez, as owner of the Townhouse, is enjoined from permitting individuals who live in or visit the Townhouse to open mailboxes that do not belong to Ivonne Suarez"; and (3) the court would retain jurisdiction to enforce, modify, or terminate the injunction.

Ultimately, in December 2023, the trial court entered an order amending the October 2023 order by replacing the paragraph concerning the noise issue. The court rejected the Suarezes' proposed language from the Broward County Ordinance because the language did not apply to residential property. Instead, the court adopted language from the Pembroke Pines Ordinance.

Consistent with the Pembroke Pines ordinance, the court ordered that Ms. Suarez "shall ensure that anyone in her Townhouse shall maintain sound decibel limits from the property line of her Townhouse" at no more than 66 dBa from 7:00 a.m. to 10 p.m. and no more than 60 dBa from 10:00 p.m. to 7:00 a.m., measured from decibel meters placed on a wall adjoining the Townhouse. The court ordered that the Association "shall be responsible for placing and maintaining" the decibel meters, that Ms.

Suarez "shall pay for one of the decibel meters," and that the Association "shall pay for any additional meters."

### *Orders on the Suarezes' Motion for New Trial*

After the trial, the Suarezes moved for a new trial, arguing in relevant part that the trial court had improperly granted a directed verdict on Count I of their counterclaim. Following multiple hearings, the trial court granted this motion, reversing its previous directed verdict for the Association on that claim.

The court noted that it had granted a directed verdict because it "believed that [the Suarezes] could not be considered sellers or buyers, so as to bring them under the purview of . . . 42 U.S.C. § 3604(f)(1)." "Upon further review," however, the court found that "the housing rights afforded under § 3604(f) do not terminate once the initial sale or rental transaction is completed." The court further found that the Association's pre-suit mediation letter "presents a genuine issue of fact as to whether [the Association] threatened [the Suarezes] with the eviction of their son, [Gabriel] Suarez, on the basis of his disability, sufficient to violate § 3604(f)(1) which could have supported a verdict in favor of [the Suarezes]."

Finding that the directed verdict was inappropriate, the court ordered a new trial "limited to Count I of Defendants' counterclaim." Later, the court clarified that the order granting new trial did not apply to Ms. Fernandez. The court eventually entered an agreed final judgment disposing of the entire case as to Ms. Fernandez.

### *The Appeals*

The Association appeals the order granting the Suarezes' motion for new trial as to Count I of the Suarezes' counterclaim. The Suarezes appeal the December 2023 injunction and the final judgment as to Ms. Fernandez. The appeals have been consolidated for all purposes.

9

***The Trial Court Erred in Granting a New Trial on Count
I of the Suarezes' Counterclaim Because the
Association's Pre-suit Mediation Demand Was Not a
Realistic or Actual Threat of Eviction***[1]

We agree with the Association that the Suarezes presented no competent evidence to support a verdict on their discrimination claim under 42 U.S.C. § 3604(f)(1) because they presented no evidence that the Association had issued an actual threat of eviction or that they had faced a genuine risk of losing their housing. The pre-suit mediation request did not constitute the kind of actual eviction threat required to support a discrimination claim under section 3604(f)(1).

The Fair Housing Act is a comprehensive open housing law. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968). Congress has declared that the policy of the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601 (2017). "The language of the Act is broad and inclusive." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972).

Section 3604(f)(1), the FHA provision at issue in the Association's appeal, makes it unlawful "[t]o discriminate in the sale or rental, **or to otherwise make unavailable or deny**, a dwelling to any buyer or renter because of a handicap of . . . (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling . . . or (C) any person associated

---

[1] We do not reach the question of whether the Association is not subject to 42 U.S.C. § 3604(f)(1) because it was not a seller or lessor of the subject property. But we note the Eleventh Circuit has recently concluded that "discrimination against a homeowner by an HOA violates the FHA." *Watts v. Joggers Run Prop. Owners Ass'n*, 133 F.4th 1032, 1042 (11th Cir. 2025). Indeed, federal courts have increasingly concluded that both section 3604(a) and section 3604(b) may apply to conduct that occurs after the sale or rental of housing, i.e., "post-acquisition conduct." *See id.* at 1040 n.7 (reiterating its prior holding that section 3604(b) applies to post-acquisition conduct); *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc) (concluding that section "3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant"); *but see Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) ("The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing.").

with that buyer or renter." 42 U.S.C. § 3604(f)(1) (2017) (emphasis added).[2]

Section 3604(f)(1) is the disability equivalent of section 3604(a), which prohibits analogous forms of housing discrimination "because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (2017). For example, while section 3604(a) prohibits housing discrimination because of race or other protected characteristics, "the relevant language is identical in subsections (a) and (f): 'otherwise make unavailable or deny, a dwelling.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1223 n.7 (11th Cir. 2016). Therefore, the Eleventh Circuit has found "no reason to distinguish section 3604(a) from section 3604(f)(1) as to this element." *Id.*

To have standing to bring a claim under the FHA, a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Wells v. Willow Lake Ests., Inc.*, 390 F. App'x 956, 958 (11th Cir. 2010) (quoting *Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009)).

Where plaintiffs remain in the property in question, a plain language reading of the statute might lead to the conclusion that the property is not "unavailable" or "denied" to them. But federal courts have extended the FHA's protections to post-acquisition discriminatory conduct amounting to constructive eviction or a realistic danger of eviction.

Thus, in *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009), the en banc Seventh Circuit proclaimed that "§ 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction." The court explained that "[p]rohibiting discrimination at the point of sale or rental but not at the moment of eviction would only go halfway toward ensuring availability of housing." *Id.* Nonetheless, analogizing the case to constructive eviction, the *Bloch* court saw "no possibility that a reasonable jury could conclude that the defendants' conduct rendered [the property]

---

[2] Other portions of section 3604 are not directly applicable to the Association's appeal but are useful for understanding the FHA as a whole and the case law interpreting it. For example, section 3604(f)(2) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(2) (2017). Section 3604(f)(2) is the disability equivalent of section 3604(b).

'unavailable' to the Blochs, which is what § 3604(a) requires," as the Blochs never moved out and instead resisted the discriminatory enforcement of a hallway rule for over a year. *Id.*

The constructive eviction rationale has been extended to realistic threats of eviction that, for various reasons, are not carried through.

In *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1223 (11th Cir. 2016), the Eleventh Circuit wrote that a "defendant need not make it impossible for a person to occupy a dwelling to make housing unavailable." There, although the defendant had never evicted the plaintiff and her adult son with Down Syndrome, the defendant "nevertheless made [the tenants'] housing unavailable by refusing to renew their lease and directing them to vacate their apartment." *Id.* The apartment only became available to the tenants again because the complex was sold and the new owners permitted them to remain. *Id.* at 1224. And the plaintiff had incurred expenses in preparing for the move that never occurred. *Id.* at 1220. On those facts, the Eleventh Circuit held that "the FHA protects renters not only from eviction, but also from discriminatory actions that would lead to eviction but for an intervening cause." *Id.* at 1223.

Cases finding a sufficient threat of eviction to trigger FHA protection typically arise within a landlord-tenant relationship. In *Wells*, the landlord notified the plaintiff that it intended to terminate their tenancy. 390 F. App'x at 959. The Eleventh Circuit held that such a threat of eviction was a "realistic danger" sufficient to confer standing for a suit over a violation of a subsection related to section 3604(f)(1). Other cases are in accord. *See Carlson v. Sunshine Villas HOA, Inc.*, No. 2:18-CV-1-FTM-99MRM, 2018 WL 2317820, at *1, *4 (M.D. Fla. May 22, 2018) (holding that a landlord's threats and attempts to evict a disabled tenant after she requested a service dog were sufficient to state a claim under section 3604(f)(1) for making housing unavailable); *Whyte v. Alston Mgmt., Inc.*, No. 10-81041-CIV, 2011 WL 12450320, at *3 (S.D. Fla. Nov. 1, 2011) (holding that a landlord violated section 3604(a) by threatening to evict tenants based on their familial status); *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446–47 (9th Cir. 1994) (holding, in a non-FHA case, that a threat of eviction is a "concrete" danger to the interests of residents sufficient to constitute injury-in-fact); *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1305–06 (4th Cir. 1992) (holding, in a non-FHA case, that an "actual threat" of eviction was enough to confer standing because "there was a realistic danger that the plaintiffs would suffer actual injury").

12

In this case, no landlord-tenant relationship existed between the Association and the Suarezes, and the statement in the pre-suit mediation demand did not present a realistic and concrete danger of eviction. With a residential landlord-and-tenant relationship, Chapter 51 and Part II of Chapter 83, Florida Statutes, create an expedited procedural pathway to the termination of a tenancy. Once a residential tenant receives a statutory notice to pay rent or vacate the premises, the case proceeds at a pace far more expedited than most lawsuits.

Here, the conditional threat of removal from the property was embedded in a pre-suit demand for mediation. The purpose of such mediation is to reduce "court dockets and trials" by "offering a more efficient, cost-effective option to litigation." § 720.311(1), Fla. Stat. (2017). The point of such mediation is to explore "possible opportunities for resolving part or all" of a dispute between the Association and a homeowner. § 720.311(2)(a), Fla. Stat. (2017). An offer to participate in pre-suit mediation is a precondition for filing a lawsuit over disputes between an association and a parcel owner "regarding use of . . . the parcel." *Id.* The purpose of the proposed mediation was for the parties to arrive at a reasonable accommodation of the issues arising from Gabriel's presence on the property. No expedited procedural pathway was available to the Association to "evict" Gabriel from the unit. Had the Suarezes attended the mediation, an accommodation might have been reached that would have avoided litigation. The Association attorney's posturing about Gabriel's permanent removal in the pre-suit mediation demand was nothing more than a hyperbolic negotiating tactic. *See* Donald J. Trump & Tony Schwartz, *Trump: The Art of the Deal* (1987).

At the time the Suarezes filed their counterclaim, no actual, realistic, concrete threat of eviction existed that rendered the property "unavailable" under 42 U.S.C. § 3604(f)(1). The pre-suit mediation letter was not an action "that would lead to eviction but for an intervening cause." *Hunt*, 814 F.3d at 1223. Thus, the trial court erred in granting the Suarezes' motion for new trial on their FHA counterclaim.

### The Injunction Entered by the Court Violates Neither Florida Law nor the Federal Housing Act

*The Suarezes' Arguments*

The Suarezes raise several arguments attacking the injunction entered in this case.

13

First, characterizing the injunction as a "mandatory injunction," they argue that the injunction is broad and unenforceable because it proscribes noise levels beyond a particular decibel level without any additional information concerning the length of time or frequency for the prohibited sounds, thus failing to give the Suarezes clear notice as to when they are in violation.

Second, the Suarezes suggest that the need for an injunction has been rendered moot because they have provided the precise relief that the Association had requested—hiring a daytime caretaker for Gabriel.

Third, the Suarezes argue that the court's findings failed to establish all the necessary elements of an injunction under Florida law.

*The Association's Arguments*

The Association responds that the trial court, sitting in equity, properly entered a reasonable injunction that balanced the equities and allowed all the parties, including Gabriel, to peacefully enjoy their homes.

First, the Association maintains that the injunction is prohibitory—not mandatory—and that it "is narrowly tailored to achieve continuing compliance with the Association's governing documents," as the injunction merely requires the Suarezes to refrain from the specific conduct of mailbox interference and allowing unreasonable noise. The Association contends that this relief was supported by the jury's verdict on Count I for declaratory relief, which found a violation of Article 10(F) of the Declaration.

Second, the Association asserts that the trial court properly "fashioned the remedy specific to the case and the claims presented," acting "within its broad discretion to fashion an appropriate remedy and responding to the specific circumstances and facts presented."

Third, the Association argues that the trial court made sufficient findings of fact to support the injunction, as the court "relied upon the jury's verdict but also made independent findings based on the evidence and testimony at trial" before concluding that the Association was entitled to an injunction to remedy the harm.

Finally, the Association argues that "the injunction serves and benefits the Park Crossing neighbors and community" by protecting "the rights and well-being of the neighbors' while remaining considerate of the Suarezes' interests."

14

*Chapter 720 and the Law Regarding Injunctions*

"Section 720.305(1) authorizes '[a]ctions at law or in equity, or both, to redress alleged failure or refusal to comply with' the requirements of chapter 720, the governing documents, and the rules of the association." *McConico v. Morgan's Mill Prop. Owners Ass'n*, 387 So. 3d 368, 370 (Fla. 6th DCA 2023).

Chapter 720's authorization of injunctive relief as a remedy for a violation of association rules of conduct dispenses with some of the preconditions that apply to injunctions sought outside of Chapter 720.

Generally, a party seeking an injunction must establish: (1) irreparable harm; (2) a clear legal right; (3) an inadequate remedy at law; and (4) consideration of the public interest. *Hiles v. Auto Bahn Fed'n, Inc.*, 498 So. 2d 997, 998 (Fla. 4th DCA 1986). Courts distinguish between prohibitory injunctions, which restrain specific conduct, and mandatory injunctions, which command specific conduct and are looked upon with disfavor. *Mayor's Jewelers, Inc. v. State of Cal. Pub. Emps.' Ret. Sys.*, 685 So. 2d 904, 910 (Fla. 4th DCA 1996) (Farmer, J., concurring).

"Every injunction shall specify the reasons for entry, shall describe in reasonable detail the act or acts restrained without reference to a pleading or another document, and shall be binding on the parties to the action[.]" Fla. R. Civ. P. 1.610(c). "This requirement of specificity and reasonable detail, based in part on notions of basic fairness, ensures that individuals against whom an injunction is directed receive explicit notice of the precise conduct that is outlawed." *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 387–88 (5th Cir. 1980). The law thus requires that an injunction should clearly let a party "know what he is ordered to do or not to do." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019).

"Because entering an injunction is an extraordinary remedy, trial courts must strictly comply with rule 1.610 to allow for meaningful appellate review." *SPC Fortebello, LLC v. Catuogno*, 343 So. 3d 1276, 1278 (Fla. 5th DCA 2022). The trial court must make "clear, definite, and unequivocally sufficient factual findings" supporting each required element for an injunction. *Shake v. Yes We Are Mad Grp., Inc.*, 315 So. 3d 1223, 1227 (Fla. 4th DCA 2021).

"Once a court of equity acquires jurisdiction over a dispute, it is authorized to administer full, complete and final relief." *Schroeder v. Gebhart*, 825 So. 2d 442, 446 (Fla. 5th DCA 2002). "A court of equity

should not be shackled by rigid rules of procedure and thereby preclude justice being administered according to good conscience." *Id.* (cleaned up). An "injunction must be narrowly tailored to the proven legal violations and restrain no more conduct than reasonably necessary." *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1280 (11th Cir. 2021).

There are some limitations on the reach of injunctions.

"[A]n injunction will not be granted where it appears that the acts complained of have already been committed and there is no showing by the pleadings and proof that there is a reasonably well-grounded probability that such course of conduct will continue in the future." *Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 870 (Fla. 3d DCA 2016) (cleaned up; hyphen added). Thus, "[w]here there is no indication the harm is likely to continue in the future, an injunction is not warranted." *The Stephan Co. v. Faulding Healthcare (IP) Holdings, Inc.*, 844 So. 2d 676, 678 (Fla. 4th DCA 2003).

Courts will also deny injunctive relief where the injunction would involve the court in ongoing supervision of the future performance. *See Mayor's Jewelers*, 685 So. 2d at 905. Thus, in *Mayor's Jewelers*, we reversed an injunction compelling a tenant to operate its store in a shopping mall for the remainder of its lease. *Id.* We agreed with other courts holding that a court's supervision of a tenant's future performance would put the court "in the business of managing a shopping center." *Id.* (quoting *New Park Forest Assocs. II v. Rogers Enters., Inc.*, 552 N.E.2d 1215, 1220 (Ill. App. Ct. 1990)).

Similarly, in *Abbey Park Homeowners Association v. Bowen*, 508 So. 2d 554 (Fla. 4th DCA 1987), we reversed a perpetual mandatory injunction compelling a homeowners' association to "maintain the common elements." *Id.* at 555. Observing that "[i]njunctive relief is an appropriate remedy for the enforcement of regulations contained in a declaration of condominium," we held that a "perpetual injunction is unenforceable and a trial court abuses its equity powers if it attempts to impose such a sanction." *Id.*

While a perpetual mandatory injunction is improper, a perpetual prohibitory injunction may be appropriate. We have recognized "the proper existence of permanent or perpetual injunctions," receding from the principle that "a perpetual injunction is unknown to the law." *Goodell v. Goodell*, 421 So. 2d 736, 737 (Fla. 4th DCA 1982). The correct principle of law is that "[u]nless otherwise provided by its terms, the injunction will remain in force as long as the court may feel that the protection which it

affords is necessary to complainant's rights, or until conditions demand a modification of that protection or its entire removal." *Id.* (quoting *Jackson Grain Co. v. Lee,* 7 So. 2d 143, 146 (Fla. 1942)).

The general requirement for injunctive relief, that there be an inadequate remedy at law and irreparable harm,[3] is relaxed under Chapter 720 enforcement cases.[4] When a homeowner or an association brings an action for injunctive relief, an alleged violation of the Homeowners' Association Act is itself a harm for which the Act authorizes injunctive relief. *See Mitchell v. Beach Club of Hallandale Condo. Ass'n,* 17 So. 3d 1265, 1267 (Fla. 4th DCA 2009) ("When bringing an action for injunctive relief against an association, an alleged violation of chapter 718 is itself a harm for which section 718.303[5] authorizes injunctive relief.").

---

[3] Irreparable harm and an inadequate remedy at law are two sides of the same coin. As Professor Laycock has observed:

> The irreparable injury rule has two formulations. Equity will act only to prevent irreparable injury, and equity will act only if there is no adequate legal remedy. The two formulations are equivalent; what makes an injury irreparable is that no other remedy can repair it. Attempts to distinguish the two formulations have produced no common usage.

*Weinstein v. Aisenberg,* 758 So. 2d 705, 708 (2000) (Gross, J. concurring) (citing Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 Harv. L. Rev. 687, 694 (1990) (footnotes omitted)).

[4] It also appears that the law does not require a showing of irreparable harm and an inadequate remedy at law to grant an injunction to enforce restrictive covenants on real property. "Where a party seeks an injunction to prevent the violation of a restrictive covenant, the party establishes a prima facie case by presenting evidence showing the violation." *Killearn Acres Homeowners Ass'n v. Keever,* 595 So. 2d 1019, 1021 (Fla. 1st DCA 1992). "Injunctive relief is normally available to redress violations of restrictive covenants affecting real property without proof of irreparable injury or a showing that a judgment for damages would be inadequate." *Autozone Stores, Inc. v. Ne. Plaza Venture,* LLC, 934 So. 2d 670, 673 (Fla. 2d DCA 2006) (cleaned up); *accord Blue Reef Holding Corp. v. Coyne,* 645 So. 2d 1053, 1055 (Fla. 4th DCA 1994) (explaining that "irreparable injury is not required to be shown to enjoin a violation of a restrictive covenant affecting real property," and that the "declaration of covenants clearly were covenants restricting real property").

[5] Sections 718.303 and 720.305, Florida Statutes (2017), contain identical language on the availability of enforcement actions.

*Connors v. Lake Dexter Woods Homeowners Ass'n*, 50 So. 3d 1212, 1213 (Fla. 2d DCA 2010), a case analogous to this one, demonstrates that injunctive relief is appropriate. In *Connors*, the Second District held that a homeowners' association was entitled to a permanent injunction enjoining a developmentally disabled adult resident from engaging in conduct that constituted a nuisance and requiring the disabled adult's guardian advocate to take all reasonable steps to prevent the disabled adult from violating the injunction. *Id.* There, the disabled adult had used "vulgar, vile, abusive and rude language" in a loud manner in the neighborhood, had threatened to hurt people, had aggressively driven his car in the neighborhood, and had been abusive to prospective home buyers, causing the neighborhood to fear him. *Id.* Although the Second District expressed "some doubt about the efficacy of an injunction as a solution to the problem," the court concluded that it had "no authority to vacate the order." *Id.* at 1214.

*Application of the Law to this Case*

None of the Suarezes' arguments warrant a reversal of the injunction.

First, we reject the Suarezes' argument that the trial court awarded injunctive relief outside the scope of the pleadings. The Association was not required to include within its complaint the specific wording of the injunction requested. *See Polk Cnty. v. Mitchell*, 931 So. 2d 922, 925 (Fla. 2d DCA 2006) (explaining that "there is no legal requirement or rule requiring the party seeking an injunction to include within the complaint the specific wording of the injunction requested").

Second, the injunction is not overly broad or unenforceable. The injunction is narrowly tailored to preventing further noise disturbances and interference with the neighbors' mail, thus addressing the proven violation of Article 10(F). Far from being "broad," the injunction precisely adopts decibel limits set by a city ordinance—an objective standard clearly delineating the acceptable levels of noise at specific hours each day. By relying on these established municipal guidelines, the court gave the Suarezes fair notice of what violates the injunction. The Suarezes can monitor the noise with a decibel meter and know exactly when the noise exceeds the limits set forth in the order. The Suarezes complain that the injunction proscribes noise levels beyond a particular decibel level without any additional information concerning the length of time or frequency for the prohibited sounds. But this does not render the injunction vague. Exceeding the noise limits for any length of time or frequency runs afoul of the injunction only if the excess noise were caused by a willful violation. *See Connors*, 50 So. 3d at 1213 (requiring the Association to establish

18

"willful and intentional violations" in any future enforcement action). That the injunction is for a "perpetual" duration does not render it unenforceable, as perpetual injunctions are permissible for prohibitory injunctions that simply prohibit conduct that violates Association rules.

Third, the Suarezes have not shown that the Association's requested relief is moot. The trial court found—and the evidence showed—that the noise was still an ongoing problem at the time of trial. While the court found that the Suarezes had obtained a daytime caregiver for Gabriel after the trial, the Suarezes have not proven at any post-trial hearing that the injunction is no longer needed because their hiring of a caretaker for a few hours each day has abated the noise and mail interference issues. The trial court retained jurisdiction to enforce, modify, or terminate the injunction.

Fourth, the Association was not required to show an inadequate remedy at law or irreparable harm because the case involved enforcement of a restrictive covenant governing real property. Chapter 720 specifically contemplates injunctive relief to redress violations of homeowner association covenants regarding behaviors that disturb other homeowners' quiet enjoyment of their property. By making injunctive relief available for rule violations under Chapter 720, the legislature has recognized that most such violations are not compensable by money damages, so no adequate remedy at law exists. As the circuit court specifically found after a four-day trial, the harms in this case—loud noises and mail theft—were a type of irreparable harm that could not be remedied short of an injunction.

Finally, the Association was not required to make a separate showing that the injunction was in the public interest. By making equitable remedies available for Chapter 720 rule violations, the legislature determined that it was in the public interest to resolve homeowners' disputes by mediation or in lawsuits at the courthouse, using equitable or other legal remedies, not by self-help, which would turn Florida into the wild west with a proliferation of stand-your-ground scenarios.

### *The Suarezes Failed to Preserve their Argument that the Injunction, on its Face, Violates the Fair Housing Act*

The Suarezes argue that the injunction, on its face, violates the Fair Housing Act. The amici, Florida Housing Umbrella Group and Disability Rights Florida, in their brief argue that the injunction relieved the Association of "its legal duty to evaluate and grant prospective reasonable accommodations" upon request.

19

The Suarezes failed to preserve this issue for appellate review. They did not object to the language the court ultimately adopted.[6] In fact, although they had objected generally to the *entry* of any injunction, they invited any error regarding the *scope* of the injunction by proposing the adoption of language tying the permissible noise levels to a local ordinance. They suggested that the trial court adopt injunction language substantially similar to the terms the court ultimately adopted.

The jury found that the Suarezes had not proposed reasonable accommodations to address their issues with the Association. Nothing in the order prevents them from seeking modification of the injunction based on a reasonable accommodation that they may propose in the future. "The terms of a permanent injunction must be confined to what is required by the circumstances justifying the injunction, and those terms are subject to alteration when those circumstances change." *E. Fed. Corp. v. State Off. Supply Co.*, 646 So. 2d 737, 741 (Fla. 1st 1994). A reasonable accommodation sought under the Fair Housing Act, based on the circumstances existing when modification is sought, can be a basis for modifying an injunction. "An individual seeking to modify or dissolve an injunction must establish that the circumstances justifying the injunction have changed so that the terms of the injunction are no longer equitable." *Elias v. Steele*, 940 So. 2d 495, 497 (Fla. 3d DCA 2006). Trial courts have broad discretion in modifying injunctions to do what is equitable. *Id.*

### *The Trial Court Properly Excluded Martha Fernandez from FHA Liability*

The Suarezes argue that the trial court erred by amending its new trial order to exclude Ms. Fernandez from individual liability on Count I of their FHA counterclaim. They argue that Ms. Fernandez was personally involved in the alleged FHA violation because she had "used her position to bring her personal complaint against" them to the Association, directly received Ms. Miller's complaint about them, and "cast her vote to bring legal action" against them, showing "willful involvement in the wrongful activity."

The Association answers that the trial court "correctly entered a directed verdict in favor of Martha Fernandez on the Suarezes' Count I of

---

[6] While the Suarezes objected to the trial court's *initial* proposed injunction language on the ground that it would violate the FHA on its face, the Suarezes did not object on this ground to the court's ultimate language adopting the decibel limits in the Pembroke Pines ordinance.

20

the Counterclaim because Martha Fernandez, individually, did not deny or make any dwelling unavailable to the Suarezes."

We agree with the Association for two reasons.

"[A]n action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). "Thus, traditional common law principles of vicarious liability apply to such claims." *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n*, 141 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015). But the principle of vicarious liability flows "upward," not "downward," meaning that "an agent is not liable simply because his principal violates the Fair Housing Act." *Id.* (cleaned up). In essence, the FHA "normally imposes vicarious liability upon the corporation but not upon its officers or owners." *Meyer*, 537 U.S. at 282.

Still, "[i]ndividual board members or agents such as property managers can be held liable when they have personally committed or contributed to a Fair Housing Act violation." *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1293 (S.D. Fla. 2014) (internal quotation marks omitted). For example, in *Fischer*, the court held that a board president had personally contributed to an FHA violation—and thus was personally liable for violating the FHA himself—by voting against a resident's reasonable accommodation request. *Id.*

By contrast, "[i]t is axiomatic that for an official to make a dwelling unavailable, that official must first have the authority and power to do so." *Meadowbriar Home for Child., Inc. v. Gunn*, 81 F.3d 521, 531 (5th Cir. 1996). For example, in *Hemisphere Building Co. v. Village of Richton Park*, No. 96 C 1268, 1996 WL 721132 at *4 (N.D. Ill. Dec. 12, 1996), the court held that village officials who were not members of village board that had denied approval of a rezoning ordinance were not liable for the alleged violation of FHA, as "[t]he alleged discriminatory decision here is the denial of the zoning petition, which only the . . . [b]oard had the authority to do."

Here, for the reasons stated above, we concluded that the trial court erred in setting aside the directed verdict on the FHA claim in the Suarez's counterclaim. If the Association is not liable on that count, neither is Ms. Fernandez.

Moreover, on the merits, none of the evidence cited by the Suarezes in support of their argument for personal liability—Ms. Fernandez's complaint to the Board about Gabriel's noise, her decision to forward Ms. Miller's complaint to the Board, and her vote as a board member to

authorize the lawsuit against the Suarezes—constituted an FHA violation. Neither Ms. Fernandez's own noise complaint, nor her forwarding of Ms. Miller's complaint, made the Suarezes' dwelling "unavailable." Similarly, the Association's lawsuit never sought to evict Gabriel or the Suarezes, so Ms. Fernandez's vote to authorize the litigation also cannot be deemed to constitute an act making unavailable or denying a dwelling.

### *The Motion for Appellate Attorney's Fees*

The Association moves for attorney's fees on three grounds: (1) Article 14.01(A) of the Declaration, which states that "any judgment rendered in any action or proceeding to enforce this Declaration or the Bylaws shall include a sum for attorney's fees"; (2) section 720.305(1), Florida Statutes, (2017), which states that "[t]he prevailing party in any such litigation [to enforce the governing documents] is entitled to recover reasonable attorney fees and costs"; and (3) FHA section 3613(c)(2), which states that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs." The Association's fee motion also seeks fees on behalf of Ms. Fernandez, but the only ground in the motion that could conceivably apply to her is FHA section 3613(c)(2), as she was a party only to the Suarezes' FHA counterclaim, and she did not individually assert any claims under the Declaration or Chapter 720.

Because we affirm the injunction in the Association's favor, the Association is entitled to prevailing party attorney's fees under the Declaration and section 720.305(1) for time spent in this appeal related to its own state law claim for injunctive relief to enforce the governing documents.

A more onerous showing is required to award attorney's fees in favor of a defendant prevailing on a claim of an FHA violation. Although the Association and Ms. Fernandez are the prevailing parties as to the Suarezes' FHA counterclaim, the movants are not entitled to attorney's fees for time spent in this appeal related to that claim unless they establish that the FHA counterclaim was "frivolous, unreasonable, or without foundation." *See Cano v. 245 C & C, LLC*, No. 19-21826-CV, 2024 WL 4350873, at *4 (S.D. Fla. Aug. 30, 2024) ("If a defendant is deemed to be a prevailing party [in an FHA action], that defendant may recover fees only 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation.'"); *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 276 (4th Cir. 2013) (affirming denial of HOA's fee motion because "it would be incongruous to allow bodies such as the HOA to enforce by contract an attorneys' fees provision against a plaintiff who has brought an FHAA action in good faith"). Nothing in the Association's motion on

this point, and nothing in this record, demonstrates that the Suarezes' FHA counterclaim was frivolous, unreasonable, or without foundation.

We therefore grant the Association's motion for attorney's fees pursuant to the Declaration and section 720.305(1) for time spent on those issues in this appeal. We deny the motion as it applies to any FHA-related issues in this appeal. The Association bears the burden of allocating the fees "to the issues for which fees are awardable or to show that the issues were so intertwined that allocation is not feasible." *22nd Century Props., LLC v. FPH Props., LLC*, 160 So. 3d 135, 143–44 (Fla. 4th DCA 2015). Because the question is not ripe for resolution, we do not reach the issue of whether the FHA is violated by an award of attorney's fees pursuant to the Declaration and section 722.305(1) for enforcement of a rule violation that interlocks with an FHA claim.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

CIKLIN, J., and SURBER, MELANIE DALE, Associate Judge, concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***

23